JOSE CAMPOAMOR v. STATE LIVE STOCK SANITARY BOARD.

182 So. 277.

En Banc.

Opinion Filed June 11, 1938.

Rehearing Denied September 30, 1938.

452

John G. Graham, Caraballo, Graham & Caraballo and W. F. Himes, for Appellant;

Cary D. Landis, Attorney General, and Tyrus A. Norwood, Assistant Attorney General, for Appellee.

TERRELL, J.—Appellant, who is a dairyman in Hillsborough County, filed his bill of complaint in the Circuit Court praying that Appellee, State Live Stock Sanitary Board be enjoined from entering his premises for the purpose of making tests or examinations of his cows or from slaughtering or attempting to slaughter them if found to be infected with Bangs disease.

A temporary restraining order was granted and the defendant filed its answer in which it denied the material allegations of the bill of complaint, asserted its power to test complainant's cattle for Bangs disease, contended that the test it applied was the most accurate known to veterinary science and was that employed by both State and Federal government. As cross complaint, the answer prayed that plaintiff be required to submit his cattle to defendant for examination and for testing. After a full hearing on evidence and argument of counsel, the Chancellor entered his final decree dismissing the bill of complaint and granting the prayer of the cross complaint. This appeal is from the final decree.

Summarized, we understand appellant's contention to be (1) that in the matter of preventing contagious and infectious diseases among domestic animals, the power of the State Live Stock Sanitary Board is limited to quarantine and that it is without authority to enter the premises of an owner before establishing a quarantine, (2) that the State Live Stock Sanitary Board is without power to destroy domestic animals found to be infected with Bangs or other contagious disease and that if it had such power, it would be harsh and unreasonable and violative of Appellant's constitutional rights unless done under notice and hearing which the applicable law does not provide for.

The Legislature of 1917 enacted Chapter 7345, Laws of Florida, creating the State Live Stock Sanitary Board defining its powers, some of which were the examination, condemnation, quarantine and destruction of domestic animals found to be infected with contagious diseases. The Legislature of 1923 enacted Chapter 9201, Laws of Florida, amplifying the powers of the State Live Stock Sanitary Board with reference to the matter of detecting, con-

trolling, and suppressing contagious diseases in domestic animals including Bangs disease.

The Legislature of 1935 enacted Chapter 17273, Laws of Florida, Section 4 of which is as follows:

"Whenever any of the diseases enumerated in Section 3 of this Act, or any other disease now or hereafter proclaimed by the State Live Stock Sanitary Board to be of a dangerous transmissible nature, shall exist anywhere within the State of Florida, or whenever it is deemed necessary or advisable to examine or test or treat any animal, the State Live Stock Sanitary Board shall have power, through its representatives and agents, to establish and enforce quarantine of and to examine or test any infected, exposed, suspected, or susceptible animals, and any goods, products, or materials that may carry contagion, and quarantine on or in or for or against any premises, area or locality within the State of Florida, under existing law."

These statutes constitute the controlling law on the subject. Statutes of this kind enacted by virtue of the police power may require an owner of domestic animals to submit them for inspection if he refuses to do so, or they may authorize constituted authority to enter the premises of an owner for that purpose. In our view, the establishment of a quarantine contemplates inspection beforehand if such in the judgment of the State Live Stock Sanitary Board is necessary and is to be done intelligently. The statute here quoted is ample to authorize quarantine and inspection under reasonable regulations before and after quarantine for the purpose of detecting, controlling, and eradicating any infectious diseases among domestic animals.

The power to enact laws to prevent the spread of infectious or contagious diseases among domestic animals is generally recognized as a proper exercise of the police power.

The Federal government under the commerce clause and the State government under the police power may in conjunction enact laws establishing quarantine for the purpose of isolating diseased or suspicious animals. Laws of this kind should not be construed to delegate powers not warranted by the Constitution but they should be liberally construed to effectuate the purpose for which they were intended.

The Legislature may also delegate authority to a governmental agency to promulgate rules and regulations to effectuate the purpose of such as are essential to detect, control, and suppress contagious diseases among domestic animals. Such regulations may be remedial and penal but they cannot be extended beyond the scope of the Act by implication or construction.

Is the State Live Stock Sanitary Board destitute of power to condemn and destroy domestic animals found to be infected with Bangs or other contagious or communicable disease or is its power limited to that of quarantine?

Chapter 7345, Acts of 1917, expressly authorized the State Live Stock Sanitary Board to condemn and destroy cattle or other domestic animals found to be infected with contagious diseases. The later acts referred to herein do not in terms authorize the destruction of live stock found to be so affected but they do carry ample power for that purpose in general terms. Chapter 9201, Acts of 1923, authorizes the State Live Stock Sanitary Board to "take such measures as in the judgment of said Board may be necessary and proper for the control, suppression, eradication, and prevention of the spread of all contagious and communicable diseases of cattle."

Even if other provisions on this subject have been repealed, the foregoing gives the Board very broad powers,

certainly broad enough to authorize it to destroy or ·take
any other steps necessary to suppress infectious or com-
municable diseases among domestic animals. This was un-
questionably the view taken by the Legislature because the
various sessions have passed Acts appropriating money to
indemnify the owners of slaughtered cattle found to be so
affected.

Chapter 17273, Acts of 1935, authorizes the State Live
Stock Sanitary Board to cooperate with the Federal Bu-
reau of Animal Industry in the control of Bangs disease
and to induce the owners of live stock to accept indemnity
for animals found to be affected wtih any communicable
disease for which they may have to be slaughtered. Under
State regulation, the owner of cattle slaughtered gets from
the State $12.50 for each cow and the value of the car-
cass. Under Federal regulation, if the animal ·slaughtered
is an ordinary grade cow, he gets from the Federal gov-
ernment $25.00 and if pure bred, he gets $50.00.

We cannot bring ourselves to hold that such provision
for compensation does not meet the requirement of due
process in a situation like this. The value of an animal
infected with Bangs disease is indeed problematical in
view of the dire results that may flow from it. It is on
this theory that summary destruction of diseased animals
has been upheld and who knows that we may not be soon
finding that the destruction of such animals may be en-
forced in the interest of the community.

In case of danger from epidemics among domestic ani-
mals from Bangs or other communicable diseases, it may
be necessary to provide for summary abatement or destruc-
tion of diseased animals. Epidemics among domestic ani-
mals sometimes become very pernicious and destructive.
It would be a strange anomaly to hold that the government
was effete and helpless in the face of circumstances of

this kind to take steps or pass laws to meet such emergencies.

It is common knowledge that when domestic animals are permitted to become congested, they are more susceptible to disease and epidemics than when limited in numbers to the open range. To contend that the law does not expand to meet and cope with emergencies that arise incident to such congestion is more than we are yet ready to accept. Neither can one affected call to his aid an assumed constitutional guaranty to defeat the power of the law to deal with such emergencies. We are fully conscious of the profound significance of constitutional guaranties in our scheme of government but they are not something rigid and straight-jacketed by which one may defy the public welfare nor may they be employed to hazard the welfare of or endanger the life of an important industry.

The doctrine of due process has no such implication when the life, health, and welfare of man or beast is involved as it has when other tangible property is at stake. In the latter case, the courts have rigidly enforced the requirements as to notice, hearing, factual investigation, and compensation, but in the former case, when epidemics arise or are threatened or when the common good is otherwise in hazard, summary proceedings may be authorized and they will be upheld so long as they go no further than are reasonably necessary to meet the situation. Statutes authorizing destruction of property under such circumstances have usually provided compensation to the owner but on the theory of benevolence or that the community should help bear the loss and not in response to the doctrine of due process. Whether they provide compensation or not, they have been upheld. Julia Miller, *et al.,* v. W. J. Schoene, 276 U. S. 272, 47 Sup. Ct. 246, 72 L. Ed. 568;

Annotation 67 A. L. R. 208; Cooley; Constitutional Limitations, 878; American Jurisprudence, Vol. II, page 810.

The record shows that the most effective way to eradicate Bangs disease is to slaughter the infected animals. It is further shown that the method used by the State Live Stock Sanitary Board to detect the infection is that generally employed and is known to be the most effective at this time. Future development in veterinary science may in years to come outmode the present methods but we are not here concerned with that.

One of the first principles of law they taught us in the law school was that the law afforded a remedy for every wrong. So many factors enter into the conduct of business now that were never known before and these factors affect the public in ways never dreamed of. It would be going a long way to hold that the law was not strong enough to correct any abuse that arises.

The judgment below is therefore affirmed.

Affirmed.

WHITFIELD, BROWN, BUFORD and CHAPMAN, J. J., concur.