**CONNOR, Commissioner of Agriculture v. CARLTON, et al.**

Nos. 518, 519, 717, 718 and 719.

Circuit Court, Martin County.

September 10, 1968.

Wilton R. Miller and Jack Shoemaker, both of Tallahassee, for the Commissioner of Agriculture.

John R. Beranek and Charles H. Damsel, Jr. of Jones, Adams, Paine & Foster, West Palm Beach, for the defendants in cases 518 and 519 and for the plaintiffs in cases 717, 718 and 719.

D. C. SMITH, Circuit Judge.

*Final decree:* The above entitled suits have been consolidated for trial.

In suits number 518 and 519, Doyle Connor, as commissioner of agriculture of the state of Florida, as plaintiff, asserts that under chapter 585, Florida Statutes 1967, he is under a duty to establish, maintain and enforce quarantine areas within the state and restrict, regulate or prohibit the movement or transportation of domestic animals found by plaintiff, by rule, to be carriers of any contagious, infectious or communicable disease, into, from, and within such areas when necessary for the carrying out of any of the purposes of said law and for the prevention or control of the spread or dissemination of any contagious, infectious or communicable diseases among said animals, and to make, promulgate and enforce rules and regulations governing the introduction of said animals into or within the state, which rules and regulations, when deemed necessary by the plaintiff, may require that all domestic animals moved into the state be covered by an official health certificate and requisite test charts, and whenever any dangerous or transmissible animal disease exists anywhere within the state the plaintiff may examine, test and treat any infected, exposed, suspected or susceptible animal, and may quarantine any premises, areas or localities in connection therewith.

Plaintiff further asserts that in pursuance of his lawful authority and duty he passed rules to control and eradicate brucellosis in Florida, which regulations, among other things, provide that all cattle in Florida are subject to the brucellosis test and that the owner or custodian thereof is required, upon receipt of official notice from the plaintiff to present his cattle for tests as therein directed. On August 30, 1967 plaintiff caused notice to be given to the defendant, directing that he, as an owner or custodian of cattle in Martin County, present all cattle located on his premises (excluding certain cattle specifically mentioned) for brucellosis tests on said premises at 8 a.m. on September 11, 1967; that the defendant disregarded his duty in this regard and failed and neglected to cause his cattle to be presented at the time specified in the notice or at any other time; that the brucellosis testing program in Martin County since its inception has revealed more than 1,171 brucellosis reactors in the county, some of which have been found in herds adjacent to the area where the defendant's herd is now located; that plaintiff, noting the incidence of brucellosis in this county had reasonable cause to believe that the defendant's herd may have such diseased animals in it; and that the defendant is under a duty to comply with all rules and regulations of plaintiff

while the area in which his cattle herd is located is under the area or county-wide quarantine, which quarantine was placed on Martin County by plaintiff's rules aforementioned.

The plaintiff seeks a mandatory injunction requiring defendant to present his cattle for testing pursuant to said regulations.

The defendant in suits number 518 and 519 has filed his answer denying the material allegations of the amended complaint in suit no. 518 and the complaint in suit no. 519 and asserting various affirmative defenses, among others, that there is no valid emergency under which the police power of the state may be exercised which would entitle the plaintiff to the relief asked for herein, but to the contrary, the purposes of the test and slaughter program referred to in the complaint are for administrative control of the transportation of cattle, and this program is not designed to protect the health, safety and morals of the community. That the statutes and rules of the department of agriculture under which this suit is brought are contrary to the constitution of the state of Florida and the constitution of the United States in this case, due to the fact that: the regulations set up by the plaintiff allow healthy animals to be destroyed without just cause or full compensation to the citizen who loses his property; that said rules and regulations require that all cattle classified as reactors be immediately branded with a "B" (at least 2″ x 2″) and slaughtered within 15 days, and the Florida Statutes limits the indemnity for said cattle to $12.50 for any one animal, contrary to section 12, declaration of rights, constitution of Florida; that the tests approved by the department of agriculture in its rules are so unreliable that many healthy cattle are classified as "reactors", then branded and destroyed, thereby appropriating the defendant's private property for public use without just compensation and without due process of law; and that the regulations and rules of the department of agriculture do not provide to the cattle owner a notice and hearing that is full and fair, not merely colorable or illusive, prior to condemnation, but proceed upon testing to condemn and brand "reactors", whether they are actively diseased or not, depriving the cattle owner of due process of law.

The defendant in each suit, no. 518 and no. 519, also filed a counterclaim reasserting his affirmative defenses as a counterclaim and seeks a decree determining each and all portions of chapter 585 and the rules and regulations of the department of agriculture, division of animal industry, chapter 7C-6, as each relates to the brucellosis plan of test and slaughter, to be unconstitutional.

In each suit number 717, 718 and 719, the plaintiff, pursuant to §585.45, Florida Statutes 1967, seeks a judicial declaration as to the validity of an order of the department of agriculture, division

of animal industry, whereby cattle owned by plaintiff are to be tested and inspected for brucellosis infection by the department, alleging that such activities under chapter 585, Florida Statutes 1967, are in violation of plaintiff's constitutional rights. The defendant has answered in each suit.

The consolidated suits have been tried. The court heard the testimony of the witnesses and argument of counsel for the respective parties. The testimony is voluminous, four and one-half days were required to present it. Five or more experts testified, several of them being shown to be the outstanding authority in their particular field and on the subject about which they testified in the United States or in the world.

§585.15, Florida Statutes, provides —

> The following named diseases and any other contagious, infectious, or communicable diseases now or hereafter proclaimed by either the commissioner or the technical committee under its emergency powers to be of a dangerous transmissible nature, shall be known as dangerous, tranmissible diseases: Glanders . . . brucellosis . . .

The commissioner of agriculture, under §585.16, Florida Statutes, is authorized —

> Whenever any of the diseases enumerated in section 585.15 or any disease now or hereafter proclaimed by either the commissioner or the technical committee under its emergency powers to be of a dangerous or transmissible nature, shall exist anywhere within the state, or whenever it is deemed necessary or advisable to dip, examine, test, identify, treat or destroy, the division may, or through its representatives and agents, dip, examine, test, identify, treat or destroy, any infected, exposed, suspected or susceptible animal and any goods, products or materials that may carry contagion, or may quarantine on or in, for or against any premises, areas, or localities within the state; provided that provisions of this chapter shall not apply to game animals.

Chapter 585 also provides —

> 585.08. *General powers of the department; rules and regulations.* — The division of animal industry is authorized through the commissioner to:
>
> (1) Establish, maintain and enforce quarantine areas within the state, or the entire state, and restrict, regulate or prohibit the movement or transportation of domestic animals and all other animals or cattle found, determined or suspected by the commissioner, or the technical committee under its emergency powers, to be carriers of any contagious, infectious or communicable disease . . .
>
> (2) . . .
>
> (3) Make, promulgate, amend, repeal and enforce rules and regulations:
>
> (a) For the carrying out of the provisions, purposes and requirements of this chapter:

(b) . . .

(c) Governing the disposal or destruction of carcasses of domestic and other animals, which are condemned or die from or while afflicted with any contagious, infectious, or communicable disease, in such manner as to prevent the spread or continuance of such contagion or infection;

(4) Condemn and destroy any domestic animals, or other animals affected with any contagious, infectious, or communicable disease, or which have been exposed to or are suspected of being liable to spread any contagious, infectious, or communicable disease.

(5) Condemn and destroy any barn, yard, shed, corral, or pen which, in the opinion of the commissioner, or the technical committee under its emergency powers, is liable to convey the said infection or contagion.

585.09 *Procedure for condemnation of domestic animals and property by department.* — Condemnation and destruction of domestic animals, barns, yards, sheds, corrals and pens, as provided in section 585.08 shall take place only after a fair appraisal of the value of the property, which value shall be determined by the commissioner and the owner; provided, however, should the commissioner and the owner be unable to agree on such value, the value shall then be determined by three disinterested appraisers, one to be appointed by the commissioner, one by the owner of the property, and the third to be selected by these two. The appraised price, subject to the provisions of section 585.10, shall be paid by the department as other expenses are paid. If the owners or person in charge of such domestic animal, barn, yard, shed, corral, or pen fails or refuses to name his or her appraiser within five days after requested by the commissioner to do so, or refuses to permit the same to be condemned and destroyed, the commissioner may make an order to the sheriff of the county wherein the property lies, directing him to destroy such domestic animal, barn, yard, shed, corral or pen, in the manner to be prescribed by such order, which order shall be executed by said sheriff forthwith. Upon the destruction of the said property by the said sheriff, the department shall have the right to recover, from the owner of the property destroyed, all costs and expenses incurred by it in connection therewith.

585.10 *Condemned and destroyed animals; limitation on payment to owner.* — The department may indemnify and reimburse the owners of all animals condemned and destroyed by order of the commissioner in cases where such animals have reacted to the tuberculin test or the agglutination blood test for brucellosis (Bang's disease); provided, however, that such indemnity or reimbursement shall not exceed the sum of twelve dollars and fifty cents for any one animal.

The rules and regulations under which the plaintiff administers the brucellosis program are chapter 7C-6 rules of the department of agriculture division of animal industry, brucellosis.

When cattle are tested under the provisions of chapter 7C-6 and found to be reactors, i.e., infected with brucellosis under the rules and regulations contained in said chapter, they are required to be branded on the left jaw with the letter "B" at least 2 inches in height and at least 2 inches in width for permanent identification (§7C-6.12) and shall be removed from the herd and sent to slaugh-

ter within 15 days (§7C-6.02(2)(d)) and must be sold at public auction markets only after sale of all other cattle has been completed (§7C-6.13).

In Campoamor v. State Live Stock Sanitary Board, 1938, 182 So. 277, which involved testing dairy cattle for Bang's disease (brucellosis), the Supreme Court of Florida stated —

> The power to enact laws to prevent the spread of infectious or contagious diseases among domestic animals is generally recognized as a proper exercise of the police power. The Federal government under the commerce clause, U.S.C.A. Const., art. 1, sec. 8, cl. 3, and the State government under the police power may in conjunction enact laws establishing quarantine for the purpose of isolating diseased or suspicious animals. Laws of this kind should not be construed to delegate powers not warranted by the Constitution but they should be liberally construed to effectuate the purpose for which they were intended.

> In case of danger from epidemics among domestic animals from Bang's or other communicable diseases, it may be necessary to provide for summary abatement or destruction of diseased animals. Epidemics among domestic animals sometimes become very pernicious and destructive. It would be a strange anomaly to hold that the government was effete and helpless in the face of circumstances of this kind to take steps or pass laws to meet such emergencies.

> It is common knowledge that when domestic animals are permitted to become congested, they are more susceptible to disease and epidemics than when limited in numbers to the open range. To contend that the law does not expand to meet and cope with emergencies that arise incident to such congestion is more than we are yet ready to accept. Neither can one affected call to his aid an assumed constitutional guaranty to defeat the power of the law to deal with such emergencies. We are fully conscious of the profound significance of constitutional guaranties in our scheme of government but they are not something rigid and straight-jacketed by which one may defy the public welfare nor may they be employed to hazard the welfare of or endanger the life of an important industry.

> The doctrine of due process has no such implication when the life, health, and welfare of man or beast is involved as it has when other tangible property is at stake. In the latter case, the courts have rigidly enforced the requirement as to notice, hearing, factual investigation, and compensation, but in the former case, when epidemics arise or are threatened or when the common good is otherwise in hazard, summary proceedings may be authorized and they will be upheld so long as they go no further than are reasonably necessary to meet the situation. Statutes authorizing destruction of property under such circumstances have usually provided compensation to the owner but on the theory of benevolence or that the community should help bear the loss and not in response to the doctrine of due process. Whether they provide compensation or not, they have been upheld. Julia Miller et al. v. W. J. Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L.Ed. 568; Annotation 67 A.L.R. 208; Cooley, Constitutional Limitations, 878; American Jurisprudence, Vol. II, page 810.

In Bedenbaugh v. Adams, 1956, 88 So.2d 765, this statement appears —

> Appellee contends that under our opinion in Campoamor v. State Live Stock Sanitary Board, 136 Fla. 451, 182 So. 277, the Livestock Board can exercise the powers granted to it by Sections 585.15 and 585.16, Florida Statutes, only in the event of an emergency of epidemic proportions. We find nothing either in the cited decision or the statutes that so limits the Board's powers. Such a limitation might be read into the Act as a reasonable prerequisite to the enforced destruction of a farmer's animals to prevent the spread of a disease but in the administering of hog cholera serum nothing is forced upon the farmer.

The court finds from the evidence that brucellosis has existed in cattle in the state of Florida and in Martin County for a number of years, that the incidence of such disease in cattle has not appreciably increased for some years and is not appreciably increasing at this time and that there is no threatened or actual epidemic or emergency in the cattle industry in the state or in Martin County due to such disease at this time. In fact, the evidence shows that during the last ten to fifteen years or more, the control of brucellosis in cattle is being accomplished quite well through a vaccination program. The court further finds that as the bovine brucellosis eradication program is now being administered by the commissioner of agriculture in Martin County, that is, under the tests that are being used to determine which animals are infected, some healthy animals are shown by the tests to be infected, when in fact they are not infected and such animals are required to be sent to slaughter along with infected animals and sent as infected animals. It is true that the percentage or number of healthy animals required to be sent to slaughter along with infected animals in most instances is not large, but such percentage or number cannot be said to be insignificant, and the evidence does definitely show that some healthy animals are sent to slaughter along with the infected animals due to the ineffectiveness of the tests being used, even though the methods being used by the plaintiff to detect the infection are those generally employed and are known to be the most effective at this time. The evidence also shows that some infected animals sent to slaughter are still productive and have a value other than a carcass value or for slaughter.

The defendants contend that any statute, rule, regulation or program which requires them, when there is no threatened or existing epidemic or emergency, to involuntarily send any non-infected animal or infected animal which is still useful and productive and which has a value other than a carcass value or for slaughter, to slaughter, without first affording the owner a full and fair hearing is unconstitutional under §12 of the declaration of rights of the Florida constitution.

In Corneal v. State Plant Board, 1957, 95 So.2d 1, a case involving the validity of a rule of the state plant board looking toward the control and containment of a citrus plant disease known as "spreading decline" which rule provided for the destruction of citrus trees, the Supreme Court of Florida stated —

> While the police power is very broad in concept, this legislative power is fenced about by constitutional limitations, and it cannot properly be exercised beyond such reasonable interferences with the liberty of action of individuals as are really necessary to preserve and protect the public health, safety and welfare. See Eelbeck Milling Company v. Mayo, Fla. 1956, 86 So.2d 438. In enacting regulatory measures which protect but do not destroy property, the law need not restrict itself to conditions actually harmful but may require precautions within the whole range of possible danger. Cf. Richardson v. Baldwin, 1936, 124 Fla. 233, 168 So. 255; State Plant Board v. Roberts, 1916, 71 Fla. 663, 72 So. 175; Los Angeles County v. Spencer, 126 Cal. 670, 59 P. 202. But the absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation. See Freund, Police Power, Sec. 520, p. 555. Domestic animals that are infected with a contagious disease and are incapable of being put to any lawful use by the owner may be summarily destroyed for the protection of the public health and safety in the exercise of the police power, although statutes providing for such destruction usually provide for compensation to the owner.

> Here, as has been noted, the regulation in question involves the destruction of healthy trees, as well as trees affected with spreading decline. Even the affected trees cannot be said to be completely worthless, since they continue to bear fruit and do not die.

> In support of the validity of the regulation, the Plant Board adduced the testimony of many witnesses that, in their opinion, the pull and treat program was an effective method of containing and preventing the further spread of the burrowing nematode and that they knew of no other method of containment. These witnesses also testified that spreading decline was a serious threat to the citrus industry and a few said that they thought an emergency existed. That no real emergency exists is clearly apparent from what has been said before as to the slowness with which the burrowing nematode progresses from tree to tree and as to the very small percentage of the total citrus acreage presently affected by a disease that has apparently been present in this state for almost thirty years.

> . . . But we cannot overlook the fact that the compulsory program requires the destruction of one owner's healthy trees for the purpose of protecting the healthy trees of his neighbor. Even if it is assumed that *all* of the healthy trees so destroyed would after an indeterminate number of years be infested with burrowing nematodes and thus be less productive than before, the fact remains that some of these healthy trees will be fully productive for at least a year or two and others for several years, depending on their proximity to a tree infested with burrowing nematodes. And from what has been said about the habits of the burrowing nematode, it is clear that a healthy tree, uninfested with a burrowing nematode, certainly offers no *immediate* menace to the trees in a neighboring grove.

We have found no case — and none has been cited — holding that a healthy plant or animal, not *imminently* dangerous, may be destroyed without compensation to the owner in order to protect a neighbor's plant or animal of the same specie. And, indeed, we would not be inclined to follow such a decision, had one been made. The increasing number of regulatory measures imposed upon its citizens by government at all levels — city, county, state and national — has perhaps accustomed us to restrictions unthought of at the time Professor Freund wrote his work on Police Power, cited above. But we hope we never become insensitive to the clear and indefeasible property rights of the people guaranteed by our state and federal organic law, nor forgetful of the principle of universal law that the right to own property is an indispensable attribute of any so-called "free government" and that all other rights become worthless if the government possesses an untrammeled power over the property of its citizens.

The Supreme Court of Florida, in State Plant Board v. Smith, 1959, 110 So.2d 401-407, another case dealing with the destruction of citrus trees under the program looking toward the containment and eradication of the citrus disease "spreading decline", stated —

Art. 2 of our constitution provides for the distribution of powers among the legislative, executive and judicial branches of our government and states that "no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution." It is settled in this state that "the determination of what is just compensation for private property that is taken for public use is a judicial function that cannot be performed by the Legislature either directly or by any method of indirection." Spafford v. Brevard County, 110 So. 451, 454. While this was a case involving the taking of property under the power of eminent domain, it is equally applicable to the legislative encroachment upon the powers of the judiciary attempted here in the taking of property under the police power.

We next consider the question of whether the Chancellor erred in holding the Act invalid insofar as it authorized the destruction of a grove owner's healthy trees "before compensation shall be paid or secured to" the owner. Here, again, the Chancellor is using the language of Sec. 29 of Art. 16, prohibiting the taking of property by eminent domain proceedings "until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; * * *" But the analogous question under the due process clause of Sec. 12, supra, is whether the owner should have been given the opportunity to have an administrative determination by the Board, and a judicial review of such administrative determination, of the amount of compensation he should receive, prior to the destruction of his healthy trees. In other words, does a summary destruction of an owner's trees followed by an administrative and judicial hearing on the question of the amount of compensation to be paid to him, comport with "due process"? An allied question, contended for in the lower court and here argued by the plaintiffs-appellees, is whether summary destruction of his trees without giving him an opportunity to be heard either administratively or judicially on the question of the propriety or reasonableness of the action by the Board's agents, is a denial of due process.

Due process of law is not an exact concept. Generally speaking, it "implies conformity with the natural and inherent principles of justice for the protection of individual rights, forbids the taking of one's property without compensation, and requires that no one be condemned in person or property without opportunity to be heard." Louis K. Liggett Co. v. Amos, 1932, 104 Fla. 609, 141 So. 153, 156. The opportunity to be heard "must be full and fair, not merely colorable or illusive." Ryan's Furniture Exchange, Inc., v. McNair, 1935, 120 Fla. 109, 162 So. 483, 487. Accord: Redman v. Kyle, 1919, 76 Fla. 79, 80 So. 300.

It is well settled, however, that the concept of due process does not necessarily require the granting of a hearing prior to the taking of official action in the exercise of the police power. Where a compelling public interest justifies the action, the Legislature may authorize summary action subject to later judicial review of the validity thereof. See Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, often cited in cases involving "due process." Thus, it has long been established that in the exercise of its police power the state may summarily seize or destroy diseased cattle, contaminated food, obscene publications, illicit intoxicants, narcotics, prohibited weapons, gambling devices and paraphernalia, and other property that menaces the public health, safety or morals. The seizure of such goods is justified because the danger exists that the property deemed malefic will be distributed to the public to its injury, or used for an illegal purpose, absent a seizure and pending a proceeding to determine the propriety of the seizure. Cf. Metallic Flowers v. City of New York, 1957, 4 A.D.2d 292, 164 N.Y.S.2d 227.

It is obvious that no such danger exists in the situation here. The citrus disease here involved — spreading decline caused by a burrowing nematode — is not carried by the wind or by insects from grove to grove; "the burrowing nematode causing the disease travels underground from one tree to another at an average rate throughout the state of 1.6 trees, or 36 feet, per year." Corneal v. State Plant Board, supra, 95 So.2d 1, 2. The fruit borne by the healthy trees, even though the tree may have some infestation, is no different from that on the uninfested trees. The only possible reason for the *summary* destruction of the healthy trees would be the imminent danger of the spread of the disease from an infested to a non-infested grove. Since the facts developed in the Corneal case, and alleged in the complaint in the instant case, show that there is no such danger, we cannot find a "compelling public interest" sufficient to justify making an exception to the basic and fundamental rule of due process, requiring notice and a hearing before depriving a person of a substantial right. This is particularly true in view of the fact that we can find no justification for the legislative declaration that "No compensation shall be made by the board for the destruction of trees which are infested by the burrowing nematode at the time of their destruction." As noted above, the question of what is "just compensation" must be finally determined by the judiciary, unless the grove owner is satisfied by the amount offered by the Board's agent. And, as previously stated, an infested tree may be healthy, in the sense that it has not yet begun to decline, and still commercially profitable. A court might wish to consider the profits expected from such productive, although infected, tree in determining "just compensation." And it is apparent that an X-mark on a map, showing an infested tree destroyed under the Board's pull and treat program, and the testimony of the parties as to the con-

dition of the tree, would not be the best evidence of the condition of the tree. Thus, in addition to the fact that the statutory provision quoted immediately above is an invasion of the province of the judiciary, it might also deny to the grower a hearing that is "full and fair, not merely colorable or illusive." Ryan's Furniture Exchange, Inc., v. McNair, supra, 162 So. 483.

> In summary, the Chancellor was correct in holding invalid those portions of the Act and the Rules of the Board placing a celling of $1,000 on the compensation to be paid to the grove owner and authorizing summary destruction of the owner's citrus trees prior to a hearing on the adequacy of compensation proposed to be paid to him. The owner is also entitled to an opportunity to be heard on the propriety or "reasonableness" of the administrative action of the Board's agents insofar as the program of pull and treat proposed for his grove is concerned, prior to the destruction of his citrus trees under such program. See Bailey v. Van Pelt, 1919, 78 Fla. 337, 353, 82 So. 789. We also agree with the Chancellor's indirect holding that the provision denying compensation for *infested* trees, without regard to whether they are still productive and not yet "declined," is unlawful.

The pronouncements of our Supreme Court in the two cases immediately above set forth are applicable to the provisions of §§585.09 and 585.10, Florida Statutes, and §7C-6.02(2)(d), rules of the department of agriculture, division of animal industry, brucellosis, when they are used to require owners of cattle, at a time when there is no threatened or existing epidemic or emergency, to involuntarily send a non-infected animal or infected animal which is still useful and productive and which has a value other than a carcass value or for slaughter, to slaughter, prior to a judicial determination of the value of such animal.

Upon the evidence and the above authorities, the court determines that §§585.09 and 585.10, Florida Statutes 1967, and §7-C-6.02(2)(d), rules of the department of agriculture, division of animal industry, are unconstitutional; that the plaintiff in suits no. 518 and 519 is not entitled to the relief sought and that the counterclaimants in suits no. 518 and 519 and the plaintiffs in suits no. 717, 718 and 719 are entitled to the relief specifically granted and hereinafter set forth herein.

Upon consideration, it is ordered and adjudged —

(1) That the amended complaint in suit no. 518 and the complaint in suit no. 519 be and the same is each hereby dismissed.

(2) That the relief sought in the counterclaim in suit no. 518 and in the counterclaim in suit no. 519 be and the same is in each suit hereby granted to the extent that §§585.09 and 585.10, Florida Statutes 1967, and §7C-6.02(2)(d), rules of the department of agriculture, division of animal industry, brucellosis, and each of

said sections, severally, is hereby determined to be unconstitutional and void.

(3) That the order described in paragraph 1 of the complaint in suit no. 717, suit no. 718 and suit no. 719 and in each of them be and the same is hereby determined to be invalid and of no effect for the reasons hereinabove set forth.

(4) That all relief prayed for by any of the parties and in each of said consolidated suits not hereinabove granted is denied.

(5) That a ruling on all motions on which a ruling was reserved until trial is granted or denied in such manner as to conform with the court's rulings hereinabove set forth and if not covered in such manner, same is hereby denied.