95 So.2d 1 (1957)
Harry CORNEAL and Gertrude Corneal, his wife, Appellants,
v.
STATE PLANT BOARD, a Body Corporate Under The Laws Of The State of Florida, and Charles Poucher, Individually and As Agent for Said Board, Appellees.
Supreme Court of Florida, Special Division B.
January 23, 1957.
Rehearing Denied March 27, 1957.
*2 Allen E. Walker and Tom B. Walker, Winter Haven, for appellants.
Richard W. Ervin, Atty. Gen., and Ralph E. Odum, Asst. Atty. Gen., for appellees.
ROBERTS, Justice.
This case has to do with the validity of a rule of the State Plant Board, appellee here, looking toward the control and containment of a citrus plant disease known as "spreading decline". In an injunction suit filed by the appellants to enjoin the State Plant Board from enforcing the provisions of the rule against them, the lower court held the rule to be valid. This appeal followed.
Spreading decline was first observed in citrus groves in this state in 1928. Preliminary investigation as to the cause of the disease was begun in 1935; however, it was not until 1953 that scientists employed by the University of Florida identified a burrowing nematode (Radopholus Similis) as the cause of the disease. This microscopic worm feeds on the feeder roots of citrus trees and eventually destroys much of the lower root system of the tree. The trees do not die, but poor foliage develops and the productivity of the tree is diminished, both as to the size and quantity of the fruit produced. Trees affected with the disease respond to extra applications of fertilizer and water, but there was evidence that trees affected with the disease are not commercially profitable under ordinary market conditions, whether specially treated or not. The burrowing nematode causing the disease travels underground from one tree to another at an average rate throughout the state of 1.6 trees, or 36 feet, per year. It may also be carried in the dirt on farm implements. There are indications that its movement is facilitated by sub-soil drainage. A past source of infection was from plantings of infested nursery stock, but this source is under control and has been eliminated as a future source of infection. The avocado tree and over one hundred ornamental plants and shrubs are "host plants" to the burrowing nematode.
*3 In 1955, the Legislature enacted Chapter 29878, Laws of 1955, Sec. 581.15, Fla. Stat. 1955, F.S.A. finding that the Florida citrus industry "is now faced with the most serious emergency it has yet encountered because of spreading decline, resulting from a burrowing nematode", and empowering the State Plant Board "to join with the U.S. Department of Agriculture or to proceed independently in a program to control and eradicate, wherever possible, spreading decline * * *" The Act appropriated $1,756,300 for the use of the Plant Board "in controlling spreading decline" and $90,800 for additional research on spreading decline. Pursuant to that Act and the authority contained in Section 581.02(10), Fla. Stat. 1955, F.S.A. to "declare a dangerous insect pest or disease to be [a] public nuisance as well as any plant or other thing infested or infected therewith or that has been exposed to infestation or infection and therefore likely to communicate same * * *", the State Plant Board on January 20, 1956, adopted Rule 53(A), declaring the burrowing nematode and each citrus and avocado tree or plant infested therewith to be a public nuisance, and each grove and nursery in which infested plants of avocado, citrus or other plants are found, to be the center of an infested and dangerous zone. The rule requires the removal and burning in the infested zone of all infested citrus and avocado trees or other plants located in the infested or dangerous zones "plus the first four trees past the last visibly affected tree, or two trees past the last tree in the roots of which burrowing nematodes are found, or all host plants within fifty feet of the last known infested tree or plant, whichever is the greater distance * *". The rule further provides that, after the trees are removed and burned, the soil must be treated with D-D soil fumigant and "said treated land must be kept free of host plants of said burrowing nematode for two years from date of treatment, except by special permission from the State Plant Board; provided, however, that control and research personnel, acting under the direction of the Plant Commissioner, may carry on such experiments with infested trees as the Plant Board may deem advisable, provided an adequate barrier is maintained around field experimental plots by application of D-D soil fumigant at the said rate for treating infested soil, such applications to be made no less often than six (6) months apart, as looking toward the control and containment of burrowing nematodes."
The program of "pull and treat", as it is called, was initiated by the Plant Board in September 1955, and at the time of the trial in July 1956 some 2,700 acres of citrus grove property had been pulled and treated.
At first the program was offered to the growers on a purely voluntary basis, with the grower signing a written release absolving the State from liability. In the Spring of 1956, however, the Plant Board initiated a compulsory program of pull and treat. The only evidence shedding any light on the reason for the change in policy is contained in the testimony of James T. Griffiths, production manager for a growers' association and a member of the so-called Spreading Decline Committee, a group of growers who studied the problem and made recommendations to the Legislature and the Plant Board. Mr. Griffiths testified that in the Spring of 1956 it was learned that federal funds would be available to supplement the state appropriation which, alone, was insufficient to complete the program, and at that time "it was decided it should be a force program primarily to get the job done within the biennial which the Legislature made the appropriations for, and the program had to be stepped up faster than it was going at that time." The total acreage planned to be pulled and treated (including the 2,700 acres already pulled and treated) was estimated to be 7,000 acres owned by an estimated 750 owners, according to the testimony of the Plant Commissioner's assistant in charge of the spreading decline program throughout the state. It was also shown that the total *4 acreage of citrus grove property in this state is estimated to be 600,000 acres.
The appellants in the instant case own a seven-acre grove, containing 703 citrus trees. As applied to the property of the appellants, the "pull and treat" program calls for the destruction of 197 citrus trees, although only 16 trees were found to be actually affected by the burrowing nematode. The position of the appellants is that there is actually no "emergency," as found by the Legislature; that the evidence shows that the "barrier" method of containing spreading decline is as effective as the "pull and treat" method and is so recognized by Rule 53(a) itself (quoted above); that, at least, the healthy trees in their grove are not a "nuisance"; and that, in all the circumstances shown by the record, the provision of the Rule authorizing the destruction of these trees is a taking of property without compensation in violation of Section 12 of the Declaration of Rights of the Florida Constitution, F.S.A. and the Fourteenth Amendment to the federal constitution. Some contention is made by the appellants that they were denied due process of law; but in view of the fact that Sec. 581.04, Fla. Stat. 1955, F.S.A. provides for a hearing as to the impact of any of the Board's rules and regulations and of the further fact that the appellants did not request a hearing, this contention cannot be sustained. But we think there is merit to their other contention, previously referred to.
While the police power is very broad in concept, this legislative power is fenced about by constitutional limitations, and it cannot properly be exercised beyond such reasonable interferences with the liberty of action of individuals as are really necessary to preserve and protect the public health, safety and welfare. See Eelbeck Milling Company v. Mayo, Fla. 1956, 86 So.2d 438. In enacting regulatory measures which protect but do not destroy property, the law need not restrict itself to conditions actually harmful but may require precautions within the whole range of possible danger. Cf. Richardson v. Baldwin, 1936, 124 Fla. 233, 168 So. 255; State Plant Board v. Roberts, 1916, 71 Fla. 663, 72 So. 175; Los Angeles County v. Spencer, 126 Cal. 670, 59 P. 202. But the absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation. See Freund, Police Power, Sec. 520, p. 555. Domestic animals that are infected with a contagious disease and are incapable of being put to any lawful use by the owner may be summarily destroyed for the protection of the public health and safety in the exercise of the police power, although statutes providing for such destruction usually provide for compensation to the owner. See Campoamor v. State Live Stock Sanitary Board, 1938, 136 Fla. 451, 182 So. 277. In an emergency created by a conflagration, a building may be destroyed, if necessary to stop the course of the fire, without subjecting the public authorities to liability for compensation, although it is said by Freund in his work on Police Power, Sec. 534, that "[w]here property is destroyed in order to save property of greater value, a provision for indemnity is a plain dictate of justice and of the principle of equality," and he observed, in Sec. 535, that statutory regulation of the power to destroy property in this situation "is always accompanied by statutory duty of compensation."
For cases upholding the validity of statutes authorizing the destruction, without compensation, of fruit or fruit trees infected with a contagious disease, see State v. Main, 1897, 69 Conn. 123, 37 A. 80, 36 L.R.A. 623 (trees infected with "peach yellows"); Colvill v. Fox, 1915, 51 Mont. 72, 149 P. 496, L.R.A. 1915F, 894 (fruit infected with apple scab); Balch v. Glenn, 1911, 85 Kan. 735, 119 P. 67, 43 L.R.A.,N.S., 1080 (trees infected with San Jose scale); Skinner v. Coy, 1939, 13 Cal.2d 407, 90 P.2d 296 (trees infected with "peach mosaic"). See also Bowman v. Virginia State Entomologist, *5 1920, 128 Va. 351, 105 S.E. 141, 12 A.L.R. 1121, upholding a statute authorizing the destruction of cedar trees located within one mile of an apple orchard, which provided for, although it did not require, compensation to be paid to the owner.
In all of these cases, except the Bowman case, the statute authorized the destruction only of trees or fruit actually diseased; and in all of them it appeared that the fruit trees so infected were or would soon be of no practical value to the owner. In all of the cases it appeared that the only practical method of eliminating or controlling the disease or pest was the destruction of the infected trees or fruit.
Here, as has been noted, the regulation in question involves the destruction of healthy trees, as well as trees affected with spreading decline. Even the affected trees cannot be said to be completely worthless, since they continue to bear fruit and do not die. Many witnesses testified, however, that a citrus tree with spreading decline is not commercially profitable; and there can be no doubt that the disease presents a serious threat to the citrus industry of this state. This being so, we think the Plant Board would have been justified in destroying the diseased trees without compensation to the owner, if this had been found to be a practicable method of containment of the disease. It was not so found, so we are required to decide whether the destruction of healthy trees as well as diseased trees (and many more of the former than the latter, in this particular case), without compensation to the owner, is a valid exercise of the Board's powers.
In support of the validity of the regulation, the Plant Board adduced the testimony of many witnesses that, in their opinion, the pull and treat program was an effective method of containing and preventing the further spread of the burrowing nematode and that they knew of no other method of containment. These witnesses also testified that spreading decline was a serious threat to the citrus industry and a few said that they thought an emergency existed. That no real emergency exists is clearly apparent from what has been said before as to the slowness with which the burrowing nematode progresses from tree to tree and as to the very small percentage of the total citrus acreage presently affected by a disease that has apparently been present in this state for almost thirty years.
It was shown by the testimony of Dr. Ross F. Suit, plant pathologist with the Florida Citrus Experiment Station, under whose supervision the research on spreading decline has been conducted and experiments on the pull and treat method carried out, that experiments are continuing on the "barrier" method of containment which "look pretty good." As defined by Dr. Suit, "a barrier would be an area of land or a strip of land free of the nematode and free of any root the nematode might live on." It does not necessarily require the removal of any trees, although a wider barrier would obviously be safer. Dr. Suit and growers who had tried the "barrier" method of containment were all of the opinion that this method of containment was not as effective as the pull and treat method, but none would state categorically that the barrier method would not contain the burrowing nematode. Dr. Suit also said that the Experiment Station was continuing its research on the development of a resistant root stock, systemic chemicals that might be sprayed on the trees to reduce the infestation in the roots, chemicals that might be put on the soil around the trees to reduce the infestation in the roots, other materials than D-D that might be satisfactory in the pull and treat method, "as well as studying the life history of the organism and finding as much as we can about its peculiarities."
Dr. Frank E. Gardner, horticulturist for the United States Department of Agriculture, testified that he considered the pull and treat method of the Board "as they are now practicing it and as they plan to pursue it" to be an effective method of containing *6 the disease. He also stated that his department is continuing its research on the problem. It was his opinion, however, that in view of the large number (over 100) of host plants, "the real solution or ultimate solution would be the finding of a resistant or immune root stock so that regardless of the introduction of infested host plants, the trees would carry on all right. * * *"
The state-wide program of "pull and treat" initiated by the Plant Board in September 1955, by its very terms, involves a two-year period during which the pulled and treated area must be kept free of host plants (a duty devolving upon the owner) and cannot be replanted with citrus except with the Board's permission. Mr. Halwin Jones, the Plant Commissioner's assistant in charge of the state-wide program of pull and treat, testified that "about six months after we push a tree, we'll begin to sample those margins again and we will carry it on through a two-year period." In response to the question, "You actually haven't done much rechecking yet, have you?", Mr. Jones replied, "Haven't been in business that long." The owners who have pulled and treated their groves under the Board's program testified that it is too early to tell yet whether the program would be successful.
From all the evidence as to the success of the experimental pull and treat program, we think the Plant Board was eminently justified in adopting the pull and treat program recommended by the Florida Citrus Experiment Station and the Spreading Decline Committee and in utilizing the funds appropriated by the Legislature in Ch. 29878, Acts of 1955, F.S.A. § 581.15, to make the program available to growers on a voluntary basis. And it clearly has no legal obligation to reimburse those owners who accepted it on that basis and signed releases to the state. Nor do we entertain the slightest doubt of the good faith of the Plant Board in changing its policy from that of a voluntary grower participation in the program to a compulsory one. But we cannot overlook the fact that the compulsory program requires the destruction of one owner's healthy trees for the purpose of protecting the healthy trees of his neighbor. Even if it is assumed that all of the healthy trees so destroyed would after an indeterminate number of years be infested with burrowing nematodes and thus be less productive than before, the fact remains that some of these healthy trees will be fully productive for at least a year or two and others for several years, depending on their proximity to a tree infested with burrowing nematodes. And from what has been said about the habits of the burrowing nematode, it is clear that a healthy tree, uninfested with a burrowing nematode, certainly offers no immediate menace to the trees in a neighboring grove.
We have found no case  and none has been cited  holding that a healthy plant or animal, not imminently dangerous, may be destroyed without compensation to the owner in order to protect a neighbor's plant or animal of the same specie. And, indeed, we would not be inclined to follow such a decision, had one been made. The increasing number of regulatory measures imposed upon its citizens by government at all levels  city, county, state and national  has perhaps accustomed us to restrictions unthought of at the time Professor Freund wrote his work on Police Power, cited above. But we hope we never become insensitive to the clear and indefeasible property rights of the people guaranteed by our state and federal organic law, nor forgetful of the principle of universal law that the right to own property is an indispensable attribute of any so-called "free government" and that all other rights become worthless if the government possesses an untrammeled power over the property of its citizens.
In all the circumstances shown by this record, recounted above, we hold that it is not only "a plain dictate of justice and of the principle of equality" that compensation *7 be made for, at least, the loss of profits sustained by the owner whose healthy trees are destroyed under the compulsory program of "pull and treat" but also, in our opinion, it is the clear legal duty of the Board to do so.
Accordingly, the decree appealed from should be and it is hereby
Reversed.
TERRELL, C.J., and THOMAS and O'CONNELL, JJ., concur.