McDONALD, Justice,
concurring specially.
' The judgment entered for Polk must be vacated. All relevant market factors in existence on the day of the taking should be considered, but this was not allowed in the trial. Polk is entitled only to the fair market value of his plants when taken. Staninger v. Jacksonville Expressway Authority, 182 So.2d 483 (Fla. 1st DCA 1966). In a normal condemnation proceeding fair market value is defined as what a willing buyer would pay and what a willing seller would accept for the property, neither acting under constraints or duress and both being fully informed. Id. Any buyer of plants is interested in the health of the plants he intends to purchase and the health and integrity of the source from which they come. Polk’s nursery contained canker-infected plants. At the time of the taking this infection was thought to be malignant and contagious. These factors would have a severe impact on what a willing buyer would pay.[8] The state should not have to compensate Polk for more than what a fully informed buyer would have paid for Polk’s plants at the time they were taken and based on knowledge that existed then.
I still have difficulty in finding a legal liability for any amount, although this Court seemingly answered that question in the ease of Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). In that case I contended that if the state acted in good faith in exercising its police power it should not have to pay damages in the form of inverse condemnation. The majority ruled, however, that “full and just compensation is required when the state, pursuant to its police power, destroys healthy trees.” Id. at 105.
To support its holding, the majority in Mid-Florida relied upon Corneal v. State Plant Board, 95 So.2d 1 (Fla.1957), and State Plant Board v. Smith, 110 So.2d 401 (Fla.1959). These cases, however, are factually distinguishable from the case at bar. Both Corneal and Smith involved the state’s efforts to combat “spreading decline,” a disease which caused citrus trees to gradually decline and eventually become commercially unprofitable. Herein lies the distinction. Spreading decline is caused by the burrowing nematode, which travels underground from one tree to another at the average rate of 1.6 trees or 36 feet per year. Citrus canker is a bacteria, which can spread rapidly, and can be transmitted by wind, water, tree clippings, fruit, or even the clothing of workers or field inspectors. It is important to note that this Court in both Corneal and Smith, in holding that the state must pay compensation for destroying healthy trees, did so by taking into account that the disease caused by the nematode spread slowly. In Corneal this Court held that the state must compensate for destroying healthy trees because, due to the fact that the disease spread slowly, the healthy trees offered no immediate menace to trees in a neighboring grove. This Court stated further that no case could be found holding that a healthy plant, not imminently dangerous, could be destroyed without compensation. In Smith this Court held that the state must pay compensation for destroying healthy trees because “[t]he citrus disease here involved- — spreading decline caused by a burrowing nematode — is not carried by the wind or by insects from grove to grove,” but rather is a disease which spreads slowly. 110 So.2d at 408 (emphasis added).
*45 Due to the fact that scientists have observed that citrus canker, whether Asian canker or the Florida Nursery strain, is capable of spreading rapidly, and may remain dormant on trees and therefore show no outward signs of disease, I would hold that the facts of this ease fit exactly into the “exception” noted by this Court in both Corneal and Smith, i.e., healthy trees may be imminently dangerous and, therefore, may be destroyed without compensation to prevent the spread of the disease to an uninfested grove. I believe that this Court has placed too much emphasis on whether the state destroys healthy or diseased trees in determining whether the state owes compensation to the deprived owner. The bottom line of my argument is that just because a tree is found to be healthy should not be determinative of the constitutionality of the taking.
In this case the commissioner acted responsibly. He relied on the best experts available who, at that time and based on what they knew, felt that the destruction of Polk’s plants was required.[9] Their opinion was shared by agents of the United States Department of Agriculture (USDA) and was not contested by Polk.
We should review the scenario leading up to the destruction of Polk’s plants. In September 1984 field inspectors for the department discovered a bacterial plant disease in Ward’s Citrus Nursery. Within days the department sent samples of the bacteria to the USDA for analysis. The USDA identified the bacteria causing the disease as xanthomonas campestris pv. citri. At that time this was the scientific name for the bacteria that causes Asian citrus canker, a disease which nearly devastated Florida’s citrus industry around 1915. Later that same month, the USDA declared an emergency because of the potential severity of the disease. Representatives of the Florida citrus industry immediately demanded that the department take action to ensure that the disease would not infest other groves. Other states such as Texas and California, as well as foreign countries, also became alarmed and requested that steps be taken to prevent any further spread of the disease. In October 1984 the USDA declared the Florida citrus canker outbreak an extraordinary emergency and, in conjunction with the department, began taking steps to eradicate the disease to prevent it from spreading.
The Florida Legislature, beginning at a special session in December 1984, also responded to the threat of citrus canker by enacting section 581.184, Florida Statutes (Supp.1986), which provided specific authority to the Commissioner of Agriculture to destroy plants carrying the disease. In March 1985 the department adopted chapter 5B-49 as part of the Florida Administrative Code, declaring citrus canker disease caused by xanthomonas campestris pv. citri a plant pest and a nuisance and authorizing quarantines, destruction of trees, and treatment of citrus to prevent an epidemic.
Almost immediately after the discovery of citrus canker, scientists began conducting extensive research to determine the exact nature of the canker discovered at Ward’s Nursery. After preliminary analysis, scientists were unsure how similar this disease was to Asian citrus canker. They knew that xanthomonas campestris pv. citri included many bacterial strains, and they knew not all of those bacteria caused Asian citrus canker. Although similar in symptomatology, scientists observed that the reaction of citrus trees exposed to this *46 bacterium was not what had been described as the typical reaction of citrus to Asian canker. The question was, just how different was this bacterium and was its effect on citrus as potentially devastating as the Asian canker.
In addition to research into the exact type of canker infesting Florida’s nurseries, scientists began conducting research on an effective means of controlling and preventing the spread of the Asian canker itself. Scientists researching infested citrus groves in Argentina determined that the Asian canker might not be as severe a threat as they had previously thought. In fact, Argentina seemed to be rather successful in controlling the disease with a properly timed copper-sulfate spray program. Scientists were still unsure, however, as to whether the citrus canker discovered in Florida’s nurseries was actually the Asian canker or some other variation of xanthomonas campestris. This was the situation when the canker in Polk's nursery was discovered.
Only recently have scientists been able to state with certainty that the canker discovered in Florida is not Asian canker, but rather a distinct form of canker which scientists now identify as the Florida Nursery strain of xanthomonas campestris. Further analysis also now indicates that there are various types of the Florida Nursery strain, both aggressive and nonaggressive. In addition, scientists now know that the canker discovered in Polk’s nursery was a nonaggressive type and that destruction of the entire nursery of 510,059 trees due to the infestation of approximately ten trees was excessive and unnecessary. When Polk’s nursery was destroyed, information gathered by scientists was moving towards an understanding of the distinct characteristics of the Florida Nursery strain, but the experts still felt destruction necessary. Three months later the department obtained enough information to modify the eradication procedures then in effect and adopted a risk assessment system under which the department probably would not have destroyed Polk’s entire nursery stock.[10] Just when scientists and the department were certain that canker was not a severe threat to the citrus industry at the time it was discovered at Polk’s nursery remains uncertain, but clearly came after Polk’s loss.[11]
In hindsight, it may be that the department overreacted and confiscated property unnecessarily, but a review of its action should not be made on hindsight. Mid-Florida Growers, 521 So.2d at 106. The department had a duty to take emergency measures to prevent what it and others perceived as an immediate harm. In viewing its action from an emergency standpoint, and considering the uncertainty concerning the exact nature of the disease, that action was reasonable. Moreover, any doubt as to whether the disease was actually dangerous at the time of the department’s actions should be resolved in favor of the department. Absent a clear showing of invalidity of the enabling statutes or an arbitrary, unreasonable administration of the program, courts should not interfere. Conner v. Carlton, 223 So.2d 324 (Fla.), appeal dismissed, 396 U.S. 272, 90 S.Ct. 481, 24 L.Ed.2d 417 (1969).
The majority’s holding in this case, in effect, places the department in a no win situation. If, as in the case at bar, the department takes action to eradicate a disease thought by itself and the USDA to be potentially devastating, and scientific research subsequent to that action later indicates that such action was unnecessary, the majority would uphold a trial court’s finding that the action was unconstitutional and require the state to pay compensation. On the other hand, if the department, relying on research that the disease might not be a serious threat to the citrus industry, *47 takes no action and the disease later spreads and causes damage to other citrus groves, such inaction could amount to an unconstitutional taking and require compensation to those owners of citrus groves damaged by the uncontrolled spread of the disease. See South Florida Growers Association, Inc. v. United States Department of Agriculture, 554 F.Supp. 633 (S.D.Fla.1982). See also St. Michael’s Convalescent Hospital v. California, 643 F.2d 1369 (9th Cir.1981); Wearly v. Federal Trade Commission, 462 F.Supp. 589 (D.N.J.1978) (Failure to provide adequate protection when property is placed in jeopardy by governmental action can amount to an unconstitutional “taking” of property by destroying it or by exposing it to the risk of destruction.), vacated on other grounds, 616 F.2d 662 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 25 (1980). Moreover, such inaction by the department could possibly cause irreparable damage to Florida’s citrus industry, a risk which the state simply cannot afford to take.
In conclusion I would hold that the department took its action in good faith, that its action was reasonable in light of the situation and scientific information known at the time, and that there should be no legal liability for its action. That is not to say, however, that the state has no moral responsibility to those who have suffered losses because of the eradication program. Indeed, such a responsibility is strong in these cases. The legislature has now recognized that the nursery owners should not have to bear the full brunt of their losses and has enacted remedial legislation.[12] The rights afforded under this legislation should be Polk’s exclusive avenue for relief. But for the statute I also believe the state would be entitled to a new trial on the taking issue.
It is important to note that the trial court and the majority both recognize that a review of state action taken pursuant to its police power should be limited to the information available at the time the state took such action. A review of the trial record, however, reveals that the trial court admitted into evidence testimony regarding scientific information discovered only after the department decided to destroy Polk’s trees. This, by itself, should constitute reversible error because any information which became available only after the fact is irrelevant and prejudicial to a determination of whether such action was reasonable. The majority refuses to address this issue by pointing to the fact that the trial court expressly stated that it based its decision only upon pertinent scientific information available at the time of the department’s action. I believe that the after-the-fact information was impossible to disregard and so tainted the trial judge’s decision-making process that, at the very least, this case should be remanded for a new trial which excludes all after-the-fact evidence.[13] Due to the unknown exact nature of the disease at the time of the department’s action, any determination of whether that action was reasonable is difficult enough. By admitting into evidence testimony that scientists later discovered that the disease was not as serious as first believed, and that the department’s action was excessive and unnecessary in light of what is known today, that determination is made even more difficult. It would be interesting to see if the trial court would reach the same decision if the eradication procedures taken by the department later proved to have in fact saved Florida’s citrus industry from irreparable harm.
OVERTON, J., concurs.

. I would think that the market knowledge of the effects of the canker at the time of the taking only may be considered, not later-obtained facts which indicated the canker was a less virulent species.

. At trial Dr. Civerolo testified that, based on the scientific knowledge and results of research testing available at the time of the destruction of Polk’s trees, the eradication procedures then being followed were proper and that it seemed more prudent to destroy the trees than to take some other action. Dr. Gabriel testified that, based on his research and studies, and knowledge available at that time, he considered the department's eradication procedures to be proper. Dr. Stall testified that, under the technology available at the time, he thought the department did about all that could have been done. Finally, Dr. Whiteside testified that in a November 1985 article he stated that, based on his studies of citrus groves in Argentina, Asian canker did not appear to be as severe a threat as he first thought and that the department’s efforts to eradicate the recent outbreaks of a bacterial disease in Florida citrus nurseries that had been classified as canker seemed logical.

. This allowed nursery stocks greater than 125 feet from infested stock to remain undisturbed, but called for a one-year quarantine.

. For a fine analysis of the scientific aspects of the Florida citrus canker epidemic from a judicial perspective, I recommend Orange County Circuit Court Judge Joseph P. Baker’s case history which he prepared in the case of Pokey’s Citrus Nurseries v. Doyie Conner, no. Cl 88-4138, a case turning on the same issues as the case on hand.

. Ch. 89-91, Laws of Fla.

. Throughout the proceeding the trial judge seemed to have been obsessed with the idea that the state should have known that the bacterium was less virulent and called for less severe methods of control. He seemingly predicated his conclusions of liability on this premise. If that is indeed the predicate, then the state is correct in contending that this was a negligence claim.