WARNER, J.
The Department of Agriculture appeals a multimillion dollar judgment in a class action for inverse condemnation. The class action sought compensation as a result of the Depai-tment’s destruction of thousands of citrus tx-ees in Palm Beach County during the Department’s Citrus *369 Canker Eradication Program (CCEP). The Department raises multiple issues dealing both with the court’s order establishing a taking, as well as with the jury trial on compensation. We address the Department’s contention that the trial court failed to apply the correct statutory presumption of harm and burden of proof in the takings portion of the trial as well as the exclusion of scientific evidence in the compensation portion of the trial. As to the application of the statutory presumption in the takings trial, not only was the evidence establishing a taking overwhelming, thus meeting the burden of proof to overcome the presumption, the issue of a compensable taking had already been resolved in Haire v. Florida Department of Agriculture and Consumer Services, 870 So.2d 774 (Fla.2004), and Patchen v. Florida Department of Agriculture and Consumer Services, 906 So.2d 1005 (Fla.2005). We reverse, however, the compensation trial, because the trial court excluded significant scientific evidence relevant to the appraisers’ valuation of the citrus trees.

Background

Florida has fought the plant disease of citrus canker for decades. It affects citrus trees by attacking their fruit, leaves and stems, causing leaf drop and unsightly fruit blemishes, even though the fruit remains edible. The bacteria which causes it is spread by wind, rain, and contamination of equipment used on trees. The history of citrus canker in Florida and the efforts to eradicate it have already been well documented in legal opinions. See Haire v. Fla. Dep’t of Agric. & Consumer Servs., 870 So.2d at 778-79; Fla. Dep’t of Agric. & Consumer Servs. v. Haire, 836 So.2d 1040, 1043-46 (Fla. 4th DCA 2003); Fla. Dep’t of Agric. & Consumer Servs. v. City of Pompano Beach, 792 So.2d 539, 541-42 (Fla. 4th DCA 2001).
The state’s main strategy to fight the disease, which has no cure, has been to eradicate it by identifying and destroying diseased trees, as well as surrounding exposed trees. At first, the Department destroyed trees within 125 feet of an infected tree. See Dep’t of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 521 So.2d 101, 102-03 (Fla.1988). In Mid-Florida Growers, our supreme court held that, although the State acted under its police power in destroying the trees, it was still required to compensate owners for the destruction of healthy trees which were not diseased. The court rejected the Department’s contention that all exposed trees were unhealthy and thus required no compensation. The court concluded that whether a taking has occurred must be determined from the facts and circumstances of each case. Id. at 103-04.
Finding that the 125-foot barrier was ineffective to stem the spread of the disease, the Department obtained another study which established a 1,900-foot radius from an infected tree, within which exposed trees should be destroyed to prevent spread and eradicate the disease. The Department first adopted a rule, followed by the enactment of section 581.184, Florida Statutes (2003), requiring the destruction of infected trees and all trees within a 1,900-foot radius of an infected tree. Section 581.184, Florida Statutes, provided methods of implementing the plan, and section 581.1845, Florida Statutes (2003), authorized compensation to homeowners for trees removed pursuant to the program at a set amount of $100 per tree.[1] In apparent recognition of the constitutional implications of the taking of private *370 property, the statute specifically provided that the compensation provided in the statute did not limit the amount which may be provided by court order for trees destroyed through the program. § 581.1845(4), Fla. Stat. (2003).
In Haire, our supreme court upheld the constitutionality of section 581.1845 as a valid exercise of the state’s police power requiring compensation for destroyed trees which were uninfected, albeit exposed:
[W]e conclude that under the statutory scheme the State is obligated to provide more than token compensation if the State has destroyed a healthy, albeit exposed tree.10 Section 581.1845 expressly states that the specified per-tree amount “does not limit the amount of any other compensation that may be paid ... pursuant to court order for the removal of citrus trees as part of a citrus canker eradication program.” § 581.1845(4) (emphasis supplied). Thus, the Citrus Canker Law sets a compensation floor that is consistent with the established principle that “the determination of what is just compensation ... is a judicial function that cannot be performed by the Legislature.” [State Plant Bd. v.] Smith, 110 So.2d [401] at 407 [ (Fla.1959) ] (quoting Spafford v. Brevard County, 92 Fla. 617, 110 So. 451, 454 (1926)).
In accord with our precedent, we conclude that the schedule established by the Legislature sets a floor but does not determine the amount of compensation. When the State destroys private property, the State is obligated to pay just and fair compensation as determined in a court of law. We emphasize that the fact that the Legislature has determined that all citrus trees within 1900 feet of an infected tree must be destroyed does not necessarily support a finding that healthy, but exposed, residential citrus trees have no value.
10 The petitioners agree that if a citrus tree shows visible signs of the disease and is therefore "infected,” there is no compensable taking.
Haire, 870 So.2d at 785.
Because the court had determined in Department of Agriculture and Consumer Services v. Polk, 568 So.2d 35 (Fla.1990), that citrus trees in a commercial nursery within 125 feet of an infected tree had no marketable value, the question remained as to whether exposed residential trees within 1,900 feet of an infected tree also were of no value, and thus required that no compensation be paid for their destruction. In Patchen, the court answered that question by stating that homeowners whose trees were within the ambit of section 581.1845 were not governed by Polk because the Legislature itself had established that they were due compensation for their trees:
The 2002 statute clearly intends that the petitioners be included within the homeowners covered by section 581.1845(2) in that their citrus trees were removed as part of a citrus canker eradication program after January 1, 1995. Polk does not apply to these homeowners. Rather, these homeowners and others similarly situated who meet the requirements of section 581.1845(2)(a), (b), and (c), may receive compensation pursuant to that statute as construed and upheld in our decision in Haire ....
906 So.2d at 1008. This included the statutorily authorized per tree compensation, as well as any court-ordered compensation contemplated by the statute. In a concurring opinion, Justice Pariente noted, “Molding that the statute applies under the circumstances of this case relieves the homeowners of the burden of proving that *371 a taking occurred, thereby eliminating the need to litigate issues such as whether the trees were a nuisance or presented an imminent danger.” Id. at 1009 (emphasis added, footnote omitted).

The Non-Jury Trial on Liability

The present case, which began in 2000, eventually evolved into an inverse condemnation and declaratory judgment class action. The class consists of all homeowners in Palm Beach County whose trees were destroyed pursuant to the CCEP. This court affirmed certification of the class in Castin v. Department of Agriculture and Consumer Services, 901 So.2d 1020, 1021 (Fla. 4th DCA 2005).
In their request for declaratory judgment, the plaintiffs alleged a dispute between the Department and the plaintiffs as to the extent of the rulings of Haire and Patchen. Specifically, the Department claimed that these cases abrogated the homeowners’ right to a remedy by inverse condemnation and did not eliminate the plaintiffs’ obligation to establish a taking. The trial court denied the Department’s motion for summary judgment on this issue and proceeded to a non-jury trial on the remaining issues. Two of these issues are relevant to the issues raised in this appeal: (1) whether the destruction of exposed but non-infected citrus trees within a 1,900-foot radius of an infected tree constituted a taking of private property; and (2) whether trees within the 1,900-foot radius which were exposed but not infected were an imminent threat to public health, safety, and welfare and constituted a public nuisance.
After a lengthy trial on these issues, where the court heard voluminous scientific evidence regarding citrus canker, its spread, and the development of the 1,900-foot buffer, the court entered a comprehensive order analyzing the takings issue and the public nuisance issue. It found that the Department had not proved that all non-infected trees within the 1,900-foot radius would become infected with the canker virus. Therefore, the destruction of the trees constituted a taking, and exposed trees did not constitute a public nuisance.

The Jury Trial on Compensation

The case proceeded to a jury trial on compensation. The Department sought to present to the jury much of the scientific evidence that it had presented during the non-jury trial. The court excluded all scientific evidence, both on citrus canker and citrus greening, another citrus disease which actually kills the tree. It determined that this evidence was duplicative of the evidence presented in the liability trial, would undermine the trial court’s findings that the trees were healthy, and was not testimony concerning the value of the destroyed trees.
The plaintiffs offered experts on tree appraisal. One expert, John Harris, testified that factors to consider when appraising a tree are species, size, condition, pest problems, and any prior maintenance. These are put into a calculation to create a single value for a “perfect” tree. Adjustments to that value are then made. Species value constitutes one important adjustment. The Florida Chapter of the American Society of Arboriculture publishes a species guide with percentages by which an appraiser can depreciate the value of a given species based upon maintenance requirements, susceptibility to disease, and other factors. This guide had not been updated since the late 1990’s. The appraiser has discretion in selecting which depreciation percentage to use. Based upon his experience with appraising citrus trees with no outward signs of exposure, Harris appraised the citrus trees involved in this litigation at 75% of full value.
*372 Eric Hoyer, the plaintiffs second appraiser, testified that an appraisal is a “snapshot” in time and does not account for future events. Appraising a tree is both “art and science,” the science being in the knowledge of the tree, soils, maintenance, etc.; the art being in selecting the appropriate methodology to appraise the tree. He relies on species, size, condition and location. In this case, he did not rely on species ratings, because he could obtain actual cost of replacement during the period the plaintiffs’ trees were destroyed. As to condition, he relied on the Department’s ratings of each destroyed tree as “good-fair-poor” and assigned a condition rating of 85%-60%-30% based upon the Department’s field findings. He assigned an across-the-board location rating of 75%.[2] He then researched the cost of replacing citrus trees during the relevant time period of 2000-2005 in Palm Beach County, allowing for different prices for different sized trees and adding in installation costs. He determined the final value of a tree of a particular size by multiplying (reducing) the replacement cost by the condition percentage rating and location percentage rating of the trees.
The plaintiffs also offered testimony from Palm Beach County citrus nursery owners to establish the replacement cost of citrus trees of various sizes during the period of the tree destruction. Over the objection of the Department, a former assistant director of the Department testified as to calculations she made regarding the cost of replacing citrus trees. A professional economist then calculated the average price of a tree destroyed during the program. Based upon the agreed total of 66,468 non-infected trees destroyed, he opined that the aggregate amount due to the class was $29,135,713.00, prior to reductions for the compensation paid pursuant to section 581.1845 and other grants given by Palm Beach County.
The Department also presented a tree appraiser as part of its case. Chuck Lippi was permitted to testify, but the court refused to allow him to present any information regarding canker or any other citrus disease which would suggest that the trees were anything other than healthy. Specifically, the court directed:
[Tjhere is not to be any testimony about these trees and scientific knowledge and documentation to support the imminency of these trees at issue in this case contracting citrus canker, but if you have an opinion based on your expertise and skill and knowledge and work in the field that citrus trees, based on the type and species they are, are prone to certain factors, one of them being the contraction of certain diseases such as greening or citrus canker, and that would impact wholesale the rating from an 80 percent rating down to a 25 percent rating, then that may be something that would be permissible for you to testify about, if you have expertise to testify about that. But it’s not going to be testimony about these trees becoming unhealthy because they were within a 1,900-foot radius. We’ve already dealt with that issue.
Lippi then testified that in his opinion, in light of the prevalence of citrus canker in South Florida at the time of the takings, the species ratings of the trees should be 25% based on his opinion that the trees were “starting to be worthless.” This would result in a substantially lower per tree value than testified to by the plaintiffs’ experts. A juror asked Lippi why his value was so low compared to the publish *373 ed species ratings. Given the court’s limitations on his testimony, he replied that he thought the published ratings were inaccurate due to the spread of citrus canker.
The head of the CCEP, Richard Gaskal-la, explained in brief detail, without scientific findings, the establishment of the program for destruction of the trees. He testified that citrus trees were susceptible to many plant diseases. Given the prevalence of canker in South Florida, he viewed the destroyed trees as having a zero value.
A certified public accountant then presented his calculation of value based upon the Department’s evidence of value. Using Lippi’s rating factors to reduce the value, he arrived at a range of cost between $887,000.00 and $1.3 million.
The court instructed the jury that the sole issue for their determination was the value of the destroyed trees:
The Court previously determined that the defendant’s destruction of the 66,493 trees owned by the plaintiffs, and the class of Palm Beach County homeowners, constituted a taking, entitling the plaintiffs, as members of the class, and the class, to full compensation under the Florida Constitution. Your sole responsibility in this trial is to determine the amount of compensation due to plaintiffs, as members of the class, and the class, for their trees which were destroyed by the Defendants.
The issue of whether defendants were legally authorized to destroy these trees, and whether these trees should or should not have been destroyed, is not a matter to be decided by you. I have already determined that, one, defendants destroyed 66,493 residential citrus trees owned by plaintiffs and members of the class. Two, the citrus trees owned by plaintiffs and members of the class were not determined to be infected with citrus canker at the time they were destroyed. Three, the citrus trees owned by the plaintiffs and members of the class had compensable value at the time they were destroyed. And, four, the proper way to determine the full amount of compensation due to plaintiffs and members of the class who owned these 66,493 trees, is based on the replacement cost of the trees.
The jury ultimately awarded the plaintiffs compensation based upon an average per-tree value of $210.00, resulting in a net judgment of $12,211,704.00, after reductions for the statutory and county compensation. Addition of interest increased the final judgment to $19,222,490.52. The Department appeals the final judgment.
After the final judgment, this court decided Department of Agriculture and Consumer Services v. Bogorff, 35 So.3d 84 (Fla. 4th DCA), rev. denied, 48 So.3d 835 (Fla.2010), an identical class action involving homeowners of destroyed citrus trees in Broward County. In Bogorff, we held that the compensation remedy provided in section 581.1845, did not supplant inverse condemnation as a remedy for a constitutional taking:
If it is not yet clear, the point is that the common law and statutory provisions for inverse condemnation do not displace the constitutional requirement for just compensation when the State destroys privately owned property to aid some industry. The only effect of § 581.1845 is to set an opening bid for the price the State will pay without litigation. As the court said in Patchen v. Fla. Dep’t of Agric. & Consumer Servs., 906 So.2d 1005, 1008 (Fla.2005):
“Citrus Canker Law sets a compensation floor that is consistent with the established principle that ‘the determination of what is just compensation ... is a judicial function that cannot *374 be performed by the Legislature’ ” [quoting Haire, 870 So.2d at 785 (quoting State Plant Board, 110 So.2d at 407 (quoting Spafford v. Brevard County, 92 Fla. 617, 110 So. 451, 454 (1926)))].
Id. at 90-91. If the compensation required by the Constitution exceeds the statutory amount, the State will have to pay that amount. Since then, the Third District has agreed that the statutory compensation does not eliminate the remedy of inverse condemnation. See Lopez-Brignoni, 114 So.3d at 1141-42. We adhere to these cases.

Applicability of Section 11.066(2)

The Department claims that the trial court erred in the takings trial by failing to apply the presumption contained in section 11.066(2), Florida Statutes, as well as the burden of proof to overcome that presumption. That statute provides:
(2) The state and each state agency, when exercising its inherent police power to protect the public health, safety, or welfare, is presumed to be acting to prevent a public harm. A person may rebut this presumption in a suit seeking monetary damages from the state or a state agency only by clear and convincing evidence to the contrary.
When the Department first raised the applicability of this statute after seven years of litigation, the plaintiffs responded that the statute did not apply because they did not contest the fact that the State was exercising its inherent authority pursuant to the police power in destroying the citrus trees. Indeed, Haire clearly established the State’s power to enact section 581.1845 and to destroy the trees. 870 So.2d at 782-83 (“There is no question that the protection of the citrus industry is a legitimate objective for the use of the State’s police power.”).
The Department seeks to use the presumption to preclude compensation for the destroyed trees, because the statute presumes that the State acted to prevent a public harm. Even if the presumption applies, however, it does not make the destroyed trees valueless for purposes of a constitutional takings claim. Only where the property is imminently dangerous may the state take the property without compensation. In Haire, the court relied on its prior opinion in Corneal v. State Plant Board, 95 So.2d 1 (Fla.1957), to explain that only in the narrowest of circumstances is compensation not required when the state destroys private property:
[W]e have also recognized that the “absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation.” Corneal, 95 So.2d at 4 (emphasis supplied). We have explained that
“[w]here property is destroyed in order to save property of greater value, a provision for indemnity is a plain dictate of justice and of the principle of equality,” and ... that statutory regulation of the power to destroy property in this situation “is always accompanied by statutory duty of compensation.”
Id. (quoting Ernst Freund, The Police Power: Public Policy and Constitutional Rights, §§ 534-35, at 564-65 (1904)) (alteration in original).
In Corneal, this Court specifically addressed the State’s destruction of healthy citrus trees as a means of controlling the spread of a citrus disease known as “spreading decline.” See id. at 2-3. The rule adopted by the State Plant Board to control the disease required the removal and burning of both infected and uninfected trees within a *375 certain distance from infected trees. See id. at 3. The Court cited domestic animals infected with a contagious disease and a burning building as examples of circumstances that justify the destruction of property without compensation. See id. at 4. Distinguishing those situations, the Court held that because the burrowing nematode, which causes spreading decline, offers “no immediate menace to the trees in a neighboring grove” and the healthy citrus trees were not “imminently dangerous,” the regulation requiring the destruction of healthy trees without compensation exceeded the scope of the State’s police powers. Id. at 6.
Under Comeal, in order for the Legislature to enact a valid statute pursuant to its police power that results in a total destruction of property without compensation, the statute must be justified by “the narrowest limits of actual necessity” and the threat must be “imminently dangerous.”
Haire, 870 So.2d at 783-84.
The supreme court pointed out in Haire, relying on our prior decision in Florida Department of Agriculture and Consumer Services v. Haire, 836 So.2d 1040, 1060 (Fla. 4th DCA 2003), that in the case of the CCEP, the Legislature recognized the need for compensation for the uninfected trees destroyed as a result of the program, thus conceding that this was a compensa-ble taking which did not involve property imminently dangerous to the public welfare. Haire, 870 So.2d at 784-86; see also Patchen, 906 So.2d at 1008. Thus, the presumption of mere “harm,” as opposed to imminent dangerousness, does not render the taking non-compensable. The Department’s position has been soundly rejected both by the Legislature and by all courts considering the issue.
Even if section 11.066(2) applied, however, there was undisputed evidence before the trial court that the State acted within its police power to destroy the uninfected trees, which were not imminently dangerous to the public as that concept has been interpreted since Corneal. As the trial court noted, the evidence was overwhelming on this issue. Thus, if the presumption of section 11.066(2) had been applied, the plaintiffs’ evidence overwhelmingly rebutted any claim that the harm was the type of dangerous harm which would preclude compensation for the taking of the trees.
Because section 11.066(2) applies only to the presumption of public harm, it is not applicable to the question of damages. The question of whether a compen-sable taking has occurred is a question for the court in an inverse condemnation case. See Mid-Florida Growers, 521 So.2d at 104 (“[T]he trial judge in an inverse condemnation suit is the trier of all issues, legal and factual, except for the question of what amount constitutes just compensation.”); see, e.g., Rubano v. Dep’t of Transp., 656 So.2d 1264, 1265-66 (Fla.1995) (reviewing trial court’s finding that a taking had occurred). The jury determines the amount of compensation but does not readdress whether a taking has occurred. See § 73.071(3), Fla. Stat. (2011) (“The jury shall determine solely the amount of compensation to be paid”) (emphasis added). Thus, even if the statutory presumption applied to the liability finding, it does not apply to the valuation of the trees.

Exclusion of Scientific Evidence

During the compensation trial, the court erred, however, in excluding the scientific evidence regarding citrus canker, as well as other citrus pests and their effects. The court also excluded evidence that the destroyed trees were within the 1,900-foot radius of an infected tree. The court ex- *376 eluded the evidence because the court viewed it as contradictory to the determination in the liability trial that the trees were healthy and had value. Moreover, the court found that the scientists could not testify to the value of the trees.
While the scientists could not testify to value, the scientific evidence regarding the diseases faced by citrus trees was relevant to the evaluation of the various appraisers’ determinations of value. All of the appraisers used species ratings and conditions ratings in their appraisals. Those ratings were based, in part, on factors such as susceptibility to disease. What and why deductions from those ratings were taken by each appraiser was a matter of expert opinion. The plaintiffs’ appraisers’ deductions differed substantially from those used by the Department’s appraiser. A juror even questioned Lippi, the Department’s appraiser, on his reasons for this discrepancy. The scientific evidence was relevant to explain his expert analysis and was part of the facts and data he relied on for his opinion.
As the trial court properly noted, determination of the value of property in a condemnation proceeding is the province of the jury. See § 73.071(3), Fla. Stat. (2011). “A jury in an eminent domain proceeding should receive all evidence relevant to the value of the property being taken.” C.E. Huffman Trucking, Inc. v. Red Cedar Corp., 723 So.2d 296, 298 (Fla. 2d DCA 1998). “[A]ny factor, including public fear, which impacts on the market value of land taken for a public purpose may be considered to explain the basis for an expert’s valuation opinion.” Fla. Power & Light Co. v. Jennings, 518 So.2d 895, 899 (Fla.1987). The supreme court reinforced the admissibility of all relevant evidence on the issue of the value in Department of Agriculture and Consumer Services v. Polk, 568 So.2d 35, 41 (Fla.1990):
Fair market value is generally defined as what a willing buyer would pay to a willing seller, neither party being obligated to act. Inherent in the concept of a willing buyer and a willing seller is that both buyer and seller are aware of all relevant facts regarding the property at issue.
(citation omitted). Thus, in Polk, the court held that the trial court erred in excluding evidence of citrus tree nursery owners that they would not have purchased trees from a dealer where citrus canker had been discovered, regardless of the condition of the trees. Id. at 41-42.
The supreme court considered an analogous situation in Finkelstein v. Department of Transportation, 656 So.2d 921 (Fla.1995). In a condemnation proceeding, the trial court excluded the department’s evidence of contamination of the property taken, which the department had sought to introduce to show the basis of their appraiser’s opinion of value. The supreme court held that the evidence of contamination of the property was relevant to explain the reason for the decrease in value as testified to by the appraiser. Id. at 922-24. Just as evidence of public fear of power lines was relevant to an expert’s value determination in Jennings, evidence of contamination would be relevant to explain the expert appraiser’s decrease in value. Id. at 924; see also Jennings, 518 So.2d at 899; Polk, 568 So.2d at 41.
Here, an understanding of the diseases to which citrus trees were subject and their increasing susceptibility to those diseases was relevant to Lippi’s testimony regarding his calculation of a species rating, an essential element of the determination of value of the trees. Even a juror asked to understand the difference between Lippi’s rating and the plaintiffs’ experts’ ratings, a difference that could not be adequately explained without reference to the science of the diseases and how they *377 spread. Moreover, the fact that the trees in question were within the radius of an infected tree was relevant to the reduction in species rating for these trees. Without the science, the expert’s species rating, which impacted value, is not explained. The court thus excluded evidence relevant to the factors impacting the value of the trees, which were the property taken.
In Finkelstein, the supreme court noted that evidence of contamination which resulted in decreased value should not be a feature of the trial because of its prejudicial nature. 656 So.2d at 925-26. Similarly, in this case, the science of citrus canker should not be a feature of the trial “beyond what is necessary to explain facts showing a reduction in value.” Id. at 925. Thus, while the court erred in entering a blanket exclusion of all six scientists and all of their testimony, on retrial the trial court should limit the testimony of the scientific experts to evidence which is necessary to explain the disease and its effect on citrus trees. In other words, our ruling does not compel the admission of all of the scientific evidence introduced in the liability trial. The evidence admitted should be sufficient to explain the appraiser’s reason for using the lower species rating, thus decreasing value of the destroyed trees.
For the foregoing reasons, we affirm the trial court’s order on liability but reverse the final judgment on compensation because of the exclusion of relevant testimony. We affirm as to all of the remaining issues presented.

Reversed and remanded for a neiv trial on compensation in accordance with this opinion.

DAMOORGIAN, C.J., and CONNER, J., concur.

. For trees destroyed during the 2003-04 fiscal year, the Legislature authorized only $55 per tree. § 581.1845(6), Fla. Stat. (2003).

. The location value has not been challenged in this appeal, as it was in Florida Department of Agriculture and Consumer Services v. Lopez-Brignoni, 114 So.3d 1138 (Fla. 3d DCA 2012); therefore, we do not express an opinion on its validity.