836 So.2d 1040 (2003)
FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Appellant,
v.
John M. and Patricia A. HAIRE, Carolyn Seligman, Laz and Ellen Schneider, Susan B. Peterson, Stephen M. Wolfman, Robert Scherer, Susan and Hiram Frank, Judith and Bernard Macnow, Mike Costa Foliage, Inc., Broward County, Miami-Dade County, City of Plantation, City of Fort Lauderdale, City of Pompano Beach, City of Coral Springs, Town of Davie, City of Hollywood, City of Boca Raton, Brooks Tropicals, Inc. and Village of Pinecrest, Appellees.
No. 4D02-2584, 4D02-3315.
District Court of Appeal of Florida, Fourth District.
January 15, 2003.
Rehearing Denied February 17, 2003.
*1042 Arthur J. England, Jr., Elliot H. Scherker and Elliot B. Kula of Greenberg Traurig, *1043 P.A., Miami, Jerold I. Budney, Greenberg Traurig, P.A., Fort Lauderdale, David C. Ashburn, Greenberg Traurig, P.A., Tallahassee, for appellant.
Robert A. Ginsburg, Miami-Dade County Attorney and Robert A Duvall, III, Assistant County Attorney, Miami, for appellee Miami-Dade County.
Edward A. Dion, Broward County Attorney, Tamara M. Scrudders, Assistant County Attorney, and Andrew J. Meyers, Chief Appellate Counsel, Fort Lauderdale, for appellee Broward County.
Craig P. Kalil of Aballi, Milne, Kalil & Escagedo, P.A., Miami, and Malcolm A. Misuraca of Resolution Law Group, Lafayette, California, for appellee Brooks Tropicals, Inc.
WARNER, J.
Appellant, the Florida Department of Agriculture ("the Department"), challenges the trial court's temporary injunction declaring the 2002 Citrus Canker Law amendments unconstitutional and enjoining the Department from entering upon private property without individually issued search warrants. The issues presented are: (1) whether section 581.184, Florida Statutes (2002), requiring the removal of citrus trees within 1900 feet of a tree infected with canker, violates substantive and procedural due process; (2) whether the Department has the authority to conduct warrantless searches of residential private property; (3) if search warrants are required, whether area-wide search warrants authorized under section 933.07(2), Florida Statutes (2002), are unconstitutional; and (4) if area-wide search warrants are unconstitutional, whether individual search warrants each supported by a separate affidavit of probable cause and signed by a neutral magistrate, without the use of an electronic signature, are mandated. We hold that section 581.184 does not violate due process and is therefore constitutional, but that section 933.07(2) does violate the Fourth Amendment. We further hold that magistrates have discretion to include multiple properties in affidavits and search warrants and to use electronic signatures.
In Florida Department of Agriculture & Consumer Services v. City of Pompano Beach, 792 So.2d 539 (Fla. 4th DCA 2001), we described the history of the citrus canker eradication effort in Florida from its discovery in 1914:
Citrus canker was discovered in Florida in 1914 and eradication programs continued through the mid 1930s. In the mid 1980s, an Asian strain of citrus canker, xanthomonas axonopodis pv.citri., the strain of citrus canker at issue in this case, was discovered in Manatee County. It was considered eradicated in 1992 and the eradication program halted in 1994. However, in 1995 an outbreak was discovered around the Miami International Airport.
Citrus canker is a disease that is caused by a bacterial organism that attacks the fruits, leaves and stems of a citrus plant. It causes defoliation, fruit drop and loss of yield. It also causes blemishes on the fruit and a loss of quality. In severe cases, it can cause girdling of the stems and death of the tree.
Stem lesions can survive for many years and are capable of producing bacterial inoculum eight to ten years later. Although symptoms of citrus canker may be seen seven to fourteen days after infection, the maximum visualization does not occur until approximately 107 to 108 days after infection. This makes it difficult to control a disease which easily spreads through wind-driven rain or contamination of equipment or plant material.
According to the Florida Department of Agriculture and Consumer Services (Department), *1044 citrus canker would have an immediate impact on the fresh citrus industry which comprises twenty-five percent of the commercial citrus industry, amounting to two billion dollars in losses if not eradicated. If it continues to spread, a federal quarantine could be placed on the state. The quarantine would effectively shut down the distribution of fresh citrus products to other states or internationally.
At the time that citrus canker, Asian strain, was discovered in Miami, the citrus canker eradication program in place called for the destruction of trees that were infected or were within a 125 foot radius of an infected tree. The 125 foot radius was adopted in the 1980s as a result of a study conducted in Argentina. However, that study did not take into account what would happen in an urban setting.
In Miami-Dade County, the destruction of citrus trees within a 125 foot radius of an infected tree was not reducing the occurrences of citrus canker. Therefore, the Department decided to initiate a study ["the Gottwald study"] that would measure the distances that citrus canker, Asian strain, would spread in South Florida.
The [Gottwald] study kept track of over 19,000 trees in four sites and determined the distance between the diseased trees and the newly infected trees. The study showed that the eradication program which used the 125 foot radius was inadequate because it only captured about thirty to forty-one percent of infection that spread from a diseased tree.
The results of the [Gottwald] study were presented at a meeting in Orlando attended by approximately twenty individuals and scientists. Those at the meeting examined the findings. After considering a range of distances between diseased trees and newly infected trees at the various sites, those present determined that in order to destroy ninety-five percent of newly infected trees, it was necessary to destroy trees within a 1900 foot radius of a diseased tree, thereby creating a buffer zone which would prevent citrus canker from spreading any further.
In March 1999, the Citrus Canker Technical Advisory Task Force, a body of regulatory individuals, scientists and citrus industry representatives who deal with the issue of citrus canker, unanimously recommended that the Department adopt a policy to destroy trees within a 1900 foot radius of a diseased tree in order to eradicate citrus canker.
Id. at 541-42.
The Department adopted the task force's recommendation in furtherance of its goal to eradicate citrus canker and implemented a policy requiring the destruction of citrus trees within 1900 feet of an infected tree. See id. at 542. Litigation ensued over the adoption of the rule on an emergency basis. See id. at 543. As a result, the Department was enjoined from cutting down healthy trees having no visible signs of infection located within 1900 feet of an infected citrus tree. See id. The trial court determined, inter alia, that the rule was not adopted in accordance with the rulemaking procedure contained in the Administrative Procedure Act. See id. at 544. We reversed the trial court's order and directed dismissal of the complaint because the plaintiffs failed to exhaust their administrative remedies. See id. at 548.
During the same time period that the plaintiffs sought an administrative review of the rule's adoption before the Division of Administrative Hearings, the Legislature reacted by enacting Florida Law Chapter 2002-11 which adopted the "1900 foot rule." Ch.2002-11, § 1, at 311, Laws of Fla. Appellees then filed an amended *1045 complaint for declaratory and injunctive relief against the Department and the State of Florida alleging that the new law violates substantive and procedural due process, constitutes the taking of property without just compensation, and permits unreasonable searches and seizures. Appellees moved for a temporary injunction, which the trial court granted after an extensive hearing. In its order, the court made the following conclusions: 1) sections 581.184 and 933.07 are unconstitutional because they violate Article I, Section 12 of the Florida Constitution and the Fourth Amendment of the United States Constitution; 2) the scientific principles upon which section 581.184 is founded are unsound and do not provide adequate justification for the legislature to abrogate the rights of property owners; 3) citrus trees that do not patently demonstrate citrus canker pathogens do have a value and cannot be destroyed without providing full and fair compensation to owners as determined in condemnation proceedings; 4) the Department "is temporarily enjoined from entering upon private property anywhere in Florida in the absence of a valid search warrant issued by an authorized judicial officer and executed by one authorized by law to do so"; 5) geographic search warrants cannot be county wide; and 6) search warrants must be executed by duly authorized law enforcement officers.
In response to the trial court's order, the Department filed an amended application for search warrants. It requested warrants to search 7,402 properties located within a single Township for plants infected with citrus canker. The Department had previously surveyed 2,350 properties in the Township and found fifty citrus trees on forty-seven properties infected with citrus canker. The Department also requested the trial judge permit it to electronically place his signature on the warrants. A trial judge, other than the judge who issued the temporary injunction, granted the Department's application for search warrants upon the following conditions: the Department would destroy only those trees actually infected with citrus canker, as opposed to merely those exposed to citrus canker; the Department would issue the landowners immediate final orders at least ten days prior to the removal and destruction of any citrus tree infected with citrus canker; and all warrants issued would be executed by law enforcement officers. That judge also granted the Department's request to electronically place his signature on the warrants.
Appellees filed an emergency motion to stay execution of the search warrants. Judge Fleet determined there was "no substantive difference between a single area-wide warrant covering 7,402 individual residences, and 7,402 `individual' warrants issued based on a single warrant application." He prohibited the Department from relying on the warrants previously authorized because they violated the terms of his order temporarily enjoining the Department. Judge Fleet also prohibited the Department from applying for warrants that would contain the issuing judges' electronic signatures or would permit execution by any employee of the Department. In addition, he proscribed the Department from relying on the Gottwald study or the 1900-foot destruction radius to establish probable cause for the issuance of any warrant.
The Department made an application "for the issuance of 69 search warrants in Broward County to seize and destroy plants visibly infected with citrus canker." Attached to the application was a list of the sixty-nine properties, each identified by its township/range/section number, parcel number, and address. The Department attached laboratory reports demonstrating each of the properties had trees *1046 visibly infected with the canker. Judge Fleet denied this warrant application as well. He determined "a single application for search warrants for multiple properties is not legally acceptable" and found the content of the application to be insufficient to meet the requirements of the Fourth Amendment of the United States Constitution and Article I, Section 12 of the Florida Constitution.
We have consolidated in this appeal the Department's appeal from the order declaring the statutes unconstitutional and temporarily enjoining the Department from entering upon private property without a search warrant, as well as the Department's petition for writ of certiorari for the review of the trial court's denial of the Department's application for sixty-nine search warrants.

Constitutionality of 2002 Citrus Canker Legislation
Section 581.184(2)(a), Florida Statutes (2002), provides:
The department shall remove and destroy all infected citrus trees and all citrus trees exposed to infection. Notice of the removal of such trees, by immediate final order, may be provided to the owner of the property on which such trees are located. An immediate final order issued by the department pursuant to this section shall notify the property owner that the citrus trees that are the subject of the immediate final order will be removed and destroyed unless the property owner, no later than 10 days after delivery of the immediate final order pursuant to subsection (3), requests and obtains a stay of the immediate final order from the district court of appeal with jurisdiction to review such requests. The property owner shall not be required to seek a stay of the immediate final order by the department prior to seeking the stay from the district court of appeal.
§ 581.184(2)(a) (emphasis added). A citrus tree is infected when it "harbor[s] the citrus canker bacteria and exhibit[s] visible symptoms of the disease." § 581.184(1)(a). A citrus tree is exposed to infection when it is "located within 1,900 feet of an infected tree." § 581.184(1)(b).[1] Section 581.1845, Florida Statutes (2002), provides for compensation for the destruction of homeowners' trees in the amount of $55 per tree or $100 per tree, depending upon the time of removal. § 581.1845(3), (6).
In its order the court found that section 581.184 was unconstitutional because it constituted a taking without just compensation and without either procedural or substantive due process. As to substantive due process, the court determined the Gottwald report was not based upon reliable science or scientific methods for collecting data and, therefore, "was not constitutionally acceptable as a basis for legislative abrogation of a property owner's right to the full panoply of protections by our State and Federal constitutions." As to procedural due process, the court held that the statute did not provide for a meaningful pre-deprivation hearing, that it removed from the judiciary the determination of whether a taking has occurred and the amount of compensation to be awarded, and that it left individuals with only the inefficacious remedy of inverse condemnation to press their claims. Accordingly, the court enjoined the enforcement of the law, stating that:
All citrus trees not patently demonstrating the existence of citrus canker pathogens have a determinable value and cannot be destroyed by the state in the *1047 absence of full and fair compensation determined by appropriate condemnation proceedings. This applies to commercial groves, citrus trees owned by municipal government and citrus trees owned by private parties.
The state challenges both of these determinations.[2]
Due to the significance the citrus industry has on Florida's economic welfare, both the legislature and the courts have continuously relied upon the state's police power to protect the industry. In Johnson v. State, 99 Fla. 1311, 128 So. 853 (1930), the supreme court said:
The protection of a large industry constituting one of the great sources of the state's wealth and therefore directly or indirectly affecting the welfare of so great a portion of the population of the state is affected to such an extent by public interest as to be within the police power of the sovereign.
Id. at 857 (citations omitted). Later, in L. Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121 (1931), the court considered legislation prohibiting citrus growers from using arsenic spray on fruit to combat the spread of pests. Growers argued that the prohibition was a violation of their constitutional right to protect their property. In upholding the statute, the court noted:
This court takes judicial notice of the fact that the citrus industry of Florida is one of its greatest assets. Its promotion and protection is of the greatest value to the state, and its advancement redounds greatly to the general welfare of the commonwealth. For this reason the Legislature necessarily has a wide field of police power within which to pass laws to foster, promote, and protect the citrus fruit industry of Florida from injurious practices which may tend to injure or destroy either the reputation or value of Florida citrus products in the world's markets.
Under the police power, the Legislature has the right to adopt suitable statutory regulations for the protection of health, the prevention of fraud, and the prevention of the prevailing public morals. This power which the Legislature has to promote the general welfare of a state is very great, and the discretion which the legislative department of the government has, in the employment of means to that end, is very large.
Id. at 128 (citations omitted). The state's police power can be exercised to protect and promote the general welfare of economic interests. In Coca-Cola Co., Food Division, Polk County v. State, 406 So.2d 1079 (Fla.1981), the court acknowledged that given the "indisputably important role that the citrus industry plays in this state's economy," id. at 1086, the police power may be used to justify regulations in this area. Id. at 1085. The court recognized the power "embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health." Id. (quoting Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915)).
Courts also have upheld the use of the police power to authorize the destruction of apparently healthy citrus trees under a citrus canker eradication program pursuant to prior Department rules. See Nordmann v. Fla. Dep't of Agric., 473 So.2d 278, 280 (Fla. 5th DCA 1985); Denney v. Conner, 462 So.2d 534, 537 (Fla. 1st DCA 1985). Nordmann and Denney upheld *1048 Department rules requiring the destruction of citrus trees within 125 feet of a canker infected tree as a proper exercise of the state police power and thus constitutional. See Nordmann, 473 So.2d at 280; Denney, 462 So.2d at 537.
The courts in Nordmann and Denney relied on Corneal v. State Plant Board, 95 So.2d 1 (Fla.1957) and State Plant Board v. Smith, 110 So.2d 401 (Fla.1959), two cases involving a nematode disease to citrus trees. The burrowing nematode disease at issue in those cases affected the root system of the trees. See Corneal, 95 So.2d at 2. Although the trees did not die, their fruit production was diminished both as to size and quantity, resulting in a loss of their commercial value. See id. To combat the spread of this disease, the State Plant Board enacted rules requiring the removal and destruction of trees surrounding the affected tree and the treatment of the surrounding soil, called the "pull and treat" program. See id. at 3.
In Corneal, the court considered whether these regulations, requiring the destruction of healthy trees without compensation, was a constitutional use of the state's police power. Acknowledging that the state's police power to protect the public welfare is very broad, it cautioned that "the absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation." Id. at 4 (emphasis added). Quoting from Freund on Police Power the court noted, "`[w]here property is destroyed in order to save property of greater value, a provision for indemnity is a plain dictate of justice and of the principle of equality,' and he [Freund] observed, in Sec. 535, that statutory regulation of the power to destroy property in this situation `is always accompanied by statutory duty of compensation.'" Id. Because the nematode threat did not pose a "real emergency" due to the slowness of its growth, id. at 5, and therefore was not "imminently dangerous" to other plants, id. at 6, the court held that the rule adopting the eradication program was unconstitutional where healthy trees were destroyed without compensation. See id. at 6-7.
After Corneal, the legislature's authorization of compensation to citrus owners for the destruction of healthy trees occurring during the "pull and treat" program was addressed in State Plant Board v. Smith. The court first held that this destruction of trees was not an act of condemnation pursuant to constitutional provisions but a due process taking, requiring just compensation. See Smith, 110 So.2d at 406. Although the legislature had set the amount of compensation in the act, the court held that the determination of what constitutes "just compensation" was a judicial function which could not be pre-empted by the Legislature. See id. at 407. Finally, the court held that the summary destruction of the trees, without providing the owner an opportunity to be heard on the issue, was a violation of procedural due process where no imminent danger of the spread of the disease was present. See id. at 409. In its analysis, the court stated:
It is well settled, however, that the concept of due process does not necessarily require the granting of a hearing prior to the taking of official action in the exercise of the police power. Where a compelling public interest justifies the action, the Legislature may authorize summary action subject to later judicial review of the validity thereof.
Id. at 407-08.
The only possible reason for the summary destruction of the healthy trees would be the imminent danger of the spread of the disease from an infested to a non-infested grove. Since the facts developed in the Corneal case, and a *1049 [sic] alleged in the complaint in the instant case, show that there is no such danger, we cannot find a `compelling' public interest's [sic] sufficient to justify making an exception to the basic and fundamental rule of due process, requiring notice and a hearing before depriving a person of a substantial right.
Id. at 408.
In Nordmann and Denney, the courts considered the impact of citrus canker on the citrus industry and the Department's authority to summarily destroy trees under regulations adopted to stop the spread of that disease. Relying on reasoning from Smith, both the Nordmann and Denney courts found that because citrus canker is spread by both natural meteorologic events, such as wind and rain, and artificial methods, such as man and machinery, plants which appeared healthy could actually be infected and present an imminent danger in the spread of the disease. See Nordmann, 473 So.2d at 280; Denney, 462 So.2d at 536. Therefore, the courts upheld as constitutional immediate final orders for the destruction of trees entered pursuant to the rules of the Department. See Nordmann, 473 So.2d at 280; Denney, 462 So.2d at 537. As the Denney court stated:
We find the immediate final order of the department states with sufficient particularity facts which indicate an immediate threat to the public health, safety, or welfare in order to justify the summary agency action in question. At this time, we hold only that the department has shown that the threat to the public interest in the citrus industry represented by citrus canker is of sufficient gravity and urgency that the effect of the immediate final order of the department should not be further stayed by this court. To further delay the order's effect would be an unwarranted judicial intrusion into the arena of administrative responsibility of an agency which has received a broad legislative mandate and grant of authority to deal with problems such as the one at hand.
462 So.2d at 536-37.
In neither case did the courts consider the questions of compensation or distinguish between healthy and diseased trees. When those issues were addressed in Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.1988), our supreme court held that, because healthy trees were being destroyed for a public benefit (the protection of the citrus industry and thus Florida's economy), id. at 103, compensation was constitutionally required, id. at 104, which in that case meant compensation for healthy trees within the 125 foot radius of trees to be destroyed because of exposure to an infected tree. Id. at 102. The court noted that "a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking," id. at 103, citing with approval the United States Supreme Court's pronouncement that "a basic understanding of `the [Fifth] Amendment makes clear that it is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.'" Id. (quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, Cal., 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). The court further relied on Corneal and Smith for its conclusion that "just compensation" was required for the destruction of healthy trees under Article X, Section 6 of the Florida Constitution.[3]See id. at 104.
*1050 In sum, because protecting the citrus industry benefits the public welfare, it is within the state's police power to summarily destroy trees to combat citrus canker. This action does not violate due process so long as compensation is given for the destruction of trees having value.[4]
As to whether the Department's actions violate substantive due process, initially the parties disagree on the test to be applied to determine whether a violation has occurred by extending the citrus tree eradication zone from the original 125 feet from an infected tree in the Department rules considered in Nordmann and Denney to 1900 feet. The Department contends that we should apply the reasonable relationship test, meaning that "due process requires that the law shall not be unreasonable, arbitrary, or capricious, and therefore courts must determine that the means selected by the legislature bear a reasonable and substantial relation to the purpose sought to be attained." In re Forfeiture of 1969 Piper Navajo, 592 So.2d 233, 235 (Fla.1992); see also Gardens Country Club, Inc. v. Palm Beach County, 712 So.2d 398, 404 (Fla. 4th DCA 1998). On the other hand, appellees argue that because the constitutional protection afforded property rights is a fundamental right, the statute must be narrowly tailored, adopting the least restrictive way of achieving permissible ends. See In re Forfeiture, 592 So.2d at 236.
United States Supreme Court precedent supports the application of the reasonable relationship test under these circumstances. Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928), is a substantially similar case involving the protection of apple trees from disease. The State of Virginia enacted statutes to protect its apple orchards from cedar rust, a disease which did not affect the cedar trees but was devastating to apple trees. See id. at 277-78, 48 S.Ct. 246. The comprehensive regulations made it illegal to own, plant or keep alive any cedar tree "which is or may be the source or `host plant' of the communicable plant disease" within two miles of an apple orchard, and declared such trees to be a public nuisance. Id. The statutes were challenged by landowners who grew red cedars on their property as ornamental plants. See id. at 277, 48 S.Ct. 246. They complained of a denial of due process in the statute's requirement of the destruction of their cedar trees. See id. In the proceedings before the Supreme Court of Virginia, the landowners claimed, inter alia, that many red cedar trees not actually infected would be destroyed. See Miller v. State Entomologist, 146 Va. 175, 135 S.E. 813, 817-18 (1926). The court dismissed this claim, stating: "The testimony shows that all red cedar trees in proximity to apple trees may be the source, harbor or host plants of cedar rest [sic]. It is not necessary to *1051 wait for absolute infection before the cedars may be destroyed." Id. at 818.
In its review, the United States Supreme Court determined the state's police power provided Virginia with the discretion to prefer one class of property over another:
When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public. It will not do to say that the case is merely one of a conflict of two private interests and that the misfortune of apple growers may not be shifted to cedar owners by ordering the destruction of their property; for it is obvious that there may be, and that here there is, a preponderant public concern in the preservation of the one interest over the other. And where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property.
Schoene, 276 U.S. at 279-80, 48 S.Ct. 246. The court continued, "where, as here, the choice is unavoidable, we cannot say that its exercise, controlled by considerations of social policy which are not unreasonable, involves any denial of due process." Id. at 280, 48 S.Ct. 246 (emphasis added).
Corneal explained that where destruction of property is authorized, the police power may be exercised "only within the narrowest limits of actual necessity, unless the state chooses to pay compensation." 95 So.2d at 4 (emphasis added). The conclusion we draw from these cases is that, where compensation is given, the statute need only pass the reasonable relationship test. Indeed, if it were otherwise, then all condemnation proceedings would be governed by the narrow tailoring standard, which is not the case. See, e.g., Canal Auth. v. Miller, 243 So.2d 131, 134 (noting reasonable necessity, not absolute necessity, is the standard for eminent domain). The cases requiring narrow tailoring, including In re Forfeiture, involve forfeitures of property without compensation for the takings. The requirement of just compensation for a taking substitutes one form of property, e.g., tangible property, for another, money. A forfeiture, on the other hand, results in an actual loss of all property to the owner. We therefore apply the reasonable relationship test.
The state has adopted as a policy the eradication of citrus canker to protect Florida's economic welfare. Indeed, in Chapter 2000-308, the predecessor to the present law, the legislature found the citrus industry was vital to the state's economy, contributing $8 billion in revenue and employing nearly 100,000 people; and an emergency existed in South Florida regarding the spread of citrus canker which could ultimately cause quarantines to be imposed on the shipment of fresh fruit. Ch.2000-308, at 3225, Laws of Fla. If not eradicated quickly, the canker would spread to other parts of the state and destroy the citrus industry. See id. The legislature also found the recent scientific studies establish that trees as far as 1900 feet from the infected tree will develop citrus canker through wind, rain or other means. See id.
For these reasons, the legislature decided to enact legislation to protect the citrus industry and chose the eradication of canker, rather than the control of it, as the best means to do so. To that end, when it was apparent that the 125 foot eradication rule was not eliminating the spread of canker, the Department conducted a study of the spread of citrus canker in an urban setting. That study, relied on by the legislature, *1052 was conducted by Dr. Tim Gottwald, a nationally recognized expert in the field of plant pathology who worked in conjunction with the United States Department of Agriculture and the University of Florida in conducting the study. His research was published in a peer reviewed journal and provided to the Florida Citrus Canker Technical Advisory Task Force which adopted and recommended to the legislature the 1900 foot buffer, which buffer was based, not only on the results of the study, but also on Florida's practical experience with the disease.
Dr. Gottwald testified that his study measured the distance of the spread of the disease in an urban setting. Although his study showed that canker could spread up to eleven miles from the source tree, the canker advisory group determined to make a compromise between the maximal distance of spread and the minimal distance. The 1900 foot zone would capture 95% of all canker spread. The Legislature chose that zone in order to include the vast majority of canker infection and exposure without having to destroy more trees than absolutely necessary. Dr. Gottwald also testified that he knew of no other means but the destruction and removal of trees to achieve the Legislature's goal to eradicate the disease, nor did he have any suggestions other than eradication for the control of canker in urban settings. All alternative means, such as spraying or developing windbreaks, were either dangerous, impractical in the urban environment, or would not result in the eradication of canker.
Appellees countered with testimony from two experts, one in applied econometrics and one in geostatistics. Neither, however, had any training in applying their fields of expertise to plant epidemiology. They each criticized some of Dr. Gottwald's methods, but Dr. Gottwald and the Department's other experts testified that appellees' experts' criticisms showed their lack of familiarity with plant epidemiological principles. Despite these weaknesses, in rejecting Dr. Gottwald's study as a sound basis for legislative action, the court adopted some of the appellees' experts' criticisms.
We note that legislatures are not limited to acting only where there is scientific certainty. See Johnson v. City of Cincinnati, 310 F.3d 484, 504 (6th Cir. 2002) (citing Ginsberg v. New York, 390 U.S. 629, 642, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). "To make scientific precision a criterion of constitutional power would be to subject the state to an intolerable supervision hostile to the basic principles of our government...." Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 76 L.Ed. 1167 (1932). Here, the Legislature had before it the advice of the Technical Advisory Board, which reviewed the study, along with the state's practical experience in fighting citrus canker for nearly twenty years. The study it relied upon was peer reviewed and published, two strong indicators of general acceptance in the scientific community. "When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment...." Id. at 388-89, 52 S.Ct. 581. See also Gandy v. Borras, 114 Fla. 503, 154 So. 248, 249 (1934). The trial court believed the Legislature should have subjected the study to adversarial testing, as in a trial. However, under a rational basis test, "a legislative choice is not subject to courtroom fact-finding...." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
Based upon these principles, the Legislature's action was amply supported by the scientific studies and Florida's practical experience with citrus canker. The Legislature *1053 followed the recommendations of the scientific community to eradicate the disease. Destruction of exposed trees and those within the area where the disease is likely to spread is neither arbitrary nor capricious and bears a reasonable relationship to the goal of canker eradication. See Schoene, 276 U.S. at 279-80, 48 S.Ct. 246. The trial court erred in rejecting the legislative choice based upon the court's own view of the scientific evidence presented.
Even if we were to apply the "narrowly tailored" test, we would find that the statute passes constitutional muster. While appellees offered experts to attack the scientific reliability of the Legislature's basis for enacting the 1900 foot eradication zone, they offered no alternative solutions. They did not point to any studies or data to show other means were available to eradicate citrus canker other than destruction of infected trees and those trees exposed to infection. Nor did they propose any other buffer measure that would prove effective in eradicating the disease. They merely asserted the study was not reliable enough to prove all the trees in the 1900 foot zone needed to be destroyed. Faced with the extreme threat to the citrus industry and the state's economic welfare, the Legislature was not required to wait until other studies could be designed and implemented to determine if there was an alternative to their chosen course of action.
[T]he choice of least infringement required under the principle enunciated in State v. Leone [118 So.2d 781 (Fla.1960)] is a choice between or among possible regulatory devices. The principle was not meant to require a choice between regulation or nonregulation. Obviously, nonregulation will always be the choice that will infringe the least on the rights of the individual.
Fla. Canners Ass'n v. State, Dep't of Citrus, 371 So.2d 503, 515 (Fla. 2d DCA 1979). We conclude that under either standard of review, the statute does not deny substantive due process.
Appellees also claim the statute violates procedural due process because it does not provide for a meaningful predeprivation hearing. In Smith, the court held that due process requires notice and a hearing before the state can deprive a person of a substantial right, e.g., the destruction of citrus trees, unless there is a reason for summary destruction, such as the "imminent danger" of the spread of the disease. 110 So.2d at 407-08. The Nordmann and Denney courts determined that the spread of citrus canker is the type of imminent danger which would permit the state to summarily destroy citrus trees. Nordmann, 473 So.2d at 280; Denney, 462 So.2d at 536.
"Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate." Phillips v. Comm'r of Internal Revenue, 283 U.S. 589, 596-97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). In an analogous situation, the Supreme Court has held that no prior hearing is necessary to seize and destroy contaminated food under the state's police power. See N. Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306, 315, 29 S.Ct. 101, 53 L.Ed. 195 (1908). The court applied the same rationale to the seizure of misbranded food supplements. See Ewing v. Mytinger & Casselberry, 339 U.S. 594, 599-600, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).
While the statute at issue in the instant appeal requires an immediate final order for the destruction of citrus trees to be served on the owner of the trees and provides for the opportunity of the owner to appeal and obtain a stay from an appellate court, the only issues considered at the stay are whether there is an infected citrus *1054 tree and whether the owner's citrus trees are within 1900 feet of the infected tree. Liability, meaning whether the destruction of the tree constitutes a taking, and the amount of just compensation due, are not determined in administrative proceedings. These are judicial questions based upon the constitution, and thus, not questions for the legislature. See Smith, 110 So.2d at 407 ("It is settled in this state that `the determination of what is just compensation for private property that is taken for public use is a judicial function that cannot be performed by the Legislature either directly or by any method of indirection'") (citation omitted).[5] Because the statute does not prohibit citrus tree owners from bringing inverse condemnation actions, the trial court erred in concluding that the statute prevents homeowners from challenging the destruction of their trees as compensable takings.
Furthermore, the availability of inverse condemnation proceedings provides the avenue for judicial review the trial court found lacking. The statute does not remove from the judge the issue of whether a taking has occurred. Nor does it remove from the jury the determination of value. Although section 581.1845 provides for a set amount of compensation per tree, it provides that the per-tree compensation "does not limit the amount of any other compensation that may be paid by another entity or pursuant to court order for the removal of citrus trees as part of a citrus canker eradication program." § 581.1845(4) (emphasis added). We conclude, therefore, that the statute does not purport to exclude inverse condemnation actions.
The homeowners' remedy for destruction of their trees is an action for inverse condemnation, an action which these homeowners have already brought. See Fla. Dep't of Agric. & Consumer Servs. v. City of Pompano Beach, 829 So.2d 928 (Fla. 4th DCA 2002). In an inverse condemnation proceeding, the court determines if the destruction of exposed but not infected trees constitutes a taking, and the jury determines the compensation to be awarded. See Mid-Florida Growers, 521 So.2d at 104. Because appellees' due process rights are protected by the availability of a judicial determination of the state's liability for the destruction of their trees, the statute does not violate procedural due process.

Necessity and Procedure for Obtaining Search Warrants
The trial court made several rulings with respect to the Department's ability to search private backyards to inspect for citrus canker. The court held section 933.07(2) unconstitutional.[6] It also required the Department to obtain a search warrant issued by a judge and executed by law enforcement officers, and it enjoined the use of area-wide search warrants. In two later orders, the trial court prohibited the Department from seeking search warrants based upon an affidavit of probable cause that covered more than one property and that contained the issuing judges' electronic signature.
The Department challenges these various orders. First, it claims a search warrant *1055 is not required, because these searches were conducted pursuant to the "exigent circumstances" exception to the warrant requirement of the Fourth Amendment. Second, it contends that section 933.07(2) authorizes area-wide administrative search warrants. Third, it challenges the court's proscription against a single application and search warrant for multiple properties, as well as its proscription against Department contractors executing the warrants. Finally, it contends that the prohibition against a judge's electronic signature also is beyond the court's power.
The Fourth Amendment right against unreasonable searches and seizures is one of the fundamental rights guaranteed in both the Federal and Florida constitutions. The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Article I, Section 12 of the Florida Constitution, is nearly identical, except that it provides that no warrant shall be issued except upon an affidavit "particularly describing the place or places to be searched." Id. (emphasis added). The Florida Constitution requires that Article I, Section 12, be construed in conformity with the Fourth Amendment to the United States Constitution.[7]See id.
We are guided by the Supreme Court's decision in Camara v. Municipal Court of City & County of San Francisco, 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), where the Supreme Court held that administrative searches of a private dwelling intrude upon interests protected by the Fourth Amendment. In that case, a residential tenant of an apartment building refused to consent to an inspection by a city building code inspector without a search warrant. See id. at 526-27, 87 S.Ct. 1727. Appellant was subsequently *1056 arrested for his refusal, prompting him to file of a writ of prohibition, in which he contended the housing code provision violated the Fourth Amendment by authorizing the inspectors to enter upon any building or structure to perform an inspection without a search warrant.
The Supreme Court held that "administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual...." Id. at 534, 87 S.Ct. 1727. The Court, however, differentiated between administrative searches and criminal searches as to the probable cause element required, explaining that where the ultimate test is the reasonableness of the search, it must be evaluated in terms of the "governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." Id. at 534-35, 87 S.Ct. 1727. Inspection programs, such as code inspections, promote the general public welfare by uncovering defects which might be hazardous to public safety. See id. at 535, 87 S.Ct. 1727. "In determining whether a particular inspection is reasonableand thus in determining whether there is probable cause to issue a warrant for that inspectionthe need for the inspection must be weighed in terms of these reasonable goals of code enforcement." Id.
While the petitioner in Camara argued the Fourth Amendment required the inspector to have probable cause to believe a code violation was present in the premises sought to be searched, the Court explained that because the only effective way to achieve code enforcement was through periodic inspections of all structures, "the agency's decision to conduct an area inspection is unavoidably based on its appraisal of conditions in the area as a whole, not on its knowledge of conditions in each particular building." Id. at 536, 87 S.Ct. 1727. To require the particularized knowledge of a violation would essentially eliminate area inspections as a method of code enforcement. Thus, the Camara Court concluded the area inspections were reasonable on three grounds: (1) code enforcement programs have a long history of judicial and public acceptance; (2) the public interest demanded the abatement of dangerous conditions but other canvassing techniques would probably not achieve the desired results; and (3) administrative searches are not personal in nature and are not aimed at discovery of a crime they involve a very limited invasion of the citizen's privacy. Id. at 537, 87 S.Ct. 1727. Accordingly, the Court approved the issuance of a warrant to inspect a particular building on the basis of an affidavit that established that the "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." Id. at 538, 87 S.Ct. 1727. "The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." Id. at 539, 87 S.Ct. 1727 (citation omitted).
The court also excepted the warrant requirement for administrative inspections in emergency situations, such as to seize unwholesome food. See id. (citing N. Am. Cold Storage Co. v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195). It further explained, "as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought *1057 only after entry is refused unless ... there is other satisfactory reason for securing immediate entry." Id. at 539-40, 87 S.Ct. 1727.
Relying upon this reasoning, the Department first argues that section 581.031(15)(a), Florida Statutes (2002), allowing the Department "to enter into or upon any place" to inspect for citrus canker does not violate appellees' Fourth Amendment rights because the intrusion into the constitutionally protected areas is so de minimus as to be reasonable. Camara, however, disposed of this argument when it held that administrative searches of constitutionally protected areas are "significant intrusions" of the type protected by the Fourth Amendment. 387 U.S. at 534, 87 S.Ct. 1727. True, the inspection in Camara intruded into the home itself. However, where the inspection is in the curtilage, that area is given the same constitutional protection as one within the walls of the home. See U.S. v. Dunn, supra n. 2. Curtilage can include the backyard of a residence. In the only similar case we could find, a California appellate court held that an agricultural inspector's warrantless search for citrus pests in a homeowner's backyard was unconstitutional, citing Camara as authority. See Vidaurri v. People, 13 Cal.App.3d 550, 553-54, 91 Cal.Rptr. 704 (Cal.Ct.App.1970). We agree that Camara requires a warrant.
Even if a warrant is normally required, the Department also argues its search for citrus canker infected trees falls within the "exigent circumstances exception to the warrant requirement." Again, we disagree that citrus canker inspections are the type of exigent circumstance which dispenses with the requirement of a warrant. In the criminal context, the term "exigent circumstances" has been defined as "a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir.1983). Circumstances that typically have been considered exigent include danger of harm to police officers or the public and the potential destruction of evidence. See id. at 1525-26; see also Vale v. Louisiana, 399 U.S. 30, 34-35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). In the administrative context, exigent circumstances are those "that will not tolerate the delay necessary to obtain a warrant or to secure [an] owner's consent ..." Michigan v. Clifford, 464 U.S. 287, 293, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (entry of fire officials into burning building to inspect cause of fire). Cases dealing with exigent circumstances in the administrative search context all involve property which could easily be destroyed or moved during the delay in getting a search warrant. See, e.g., United States v. Schafer, 461 F.2d 856, 858 (9th Cir.), cert. denied, 409 U.S. 881, 93 S.Ct. 211, 34 L.Ed.2d 136 (1972) (agriculture quarantine search of bags at airport); N. Am. Cold Storage v. City of Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (summary seizure of unwholesome food to prevent harm which would result from its sale to public); State v. Kelly, 205 Mont. 417, 668 P.2d 1032 (1983) (federal plant inspection of UPS box leaving Hawaii); State v. Bailey, 120 Ariz. 399, 586 P.2d 648 (Ct.App.1978) (warrantless search of vehicle at agricultural inspection station).
Although there is an "economic emergency" to the citrus industry from the spread of citrus canker, that does not suggest the type of emergency or exigent circumstance necessary to dispense with the warrant requirement. The infected trees themselves are not immediately dangerous to public health and safety, even if they may be imminently dangerous to the citrus industry. Moreover, there is no danger the trees will be moved during the *1058 period of time necessary to get a warrant. In fact, the Department's own conduct during the inspections as described at the hearing suggests that even they are not concerned that these trees pose an immediate danger to the citrus industries. Many times infected trees are identified and not removed for days, weeks or months. That is more than sufficient time to honor the constitutional rights of the citizen and obtain a warrant issued by a neutral magistrate. We hold the exigent circumstances exception does not excuse the Department from obtaining a warrant to search constitutionally protected property.[8] Furthermore, the Legislature itself appears to have concluded that warrants should be required for administrative searches because it enacted section 933.07(2), authorizing area-wide search warrants. That section provides:
(2) Notwithstanding any other provisions of this chapter, the Department of Agriculture and Consumer Services, based on grounds specified in s. 933.02(4)(d) or (e), may obtain a search warrant authorized by this chapter for an area in size up to and including the full extent of the county in which the search warrant is issued. The judge issuing such search warrant shall conduct a court proceeding prior to the issuance of such search warrant upon reasonable notice and shall receive, hear, and determine any objections by property owners to the issuance of such search warrant. Such search warrant may be served by employees or authorized contractors of the Department of Agriculture and Consumer Services. Such search warrant may be made returnable at any time up to 6 months from the date of issuance.
Next, the Department maintains Camara permits area-wide search warrants. Camara suggests no such thing. As explained above, Camara allows a relaxed probable cause evaluation based upon findings that "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." Camara, 387 U.S. at 538, 87 S.Ct. 1727. It never suggested that the warrant itself could be issued other than in conformance with the Fourth Amendment, which requires particularity in the description of the property to be searched. In fact, the Court specifically noted the Fourth Amendment's requirement of particularity. See id. at 539, 87 S.Ct. 1727. While Camara does not require a finding that a particular property poses a specific threat of violating the administrative scheme, see Roche v. State, 462 So.2d 1096, 1100 (Fla.1985), it still requires that the property to be searched be described with particularity. A search warrant merely describing the property to be searched as the entire county, or even a section of that county, is patently unconstitutional.
The trial court also enjoined the Department from seeking search warrants for multiple parcels of property based upon a single affidavit of probable cause. It required one affidavit for each search warrant, and neither could include more than one parcel of property to be searched. It also prohibited the Department from relying on the statutory 1900 foot requirement to justify searches for infected or exposed trees. We conclude that the trial court erred in imposing these restrictions on the Department.
*1059 Nothing in the statutes or case law prohibits an affidavit of probable cause from including more than one parcel of property upon which the affiant seeks the issuance of a search warrant. The Florida Constitution impliedly permits search warrants, and thus affidavits, to cover more than one parcel of property when it states that the warrant must describe the "place or places" to be searched. See Art. I, § 12, Fla. Const. (emphasis added). So long as the affidavit provides probable cause to search and lists with particularity the properties to be searched, the constitutional and statutory requirements have been satisfied. Courts in other states have upheld the issuance of warrants, upon a single application, providing for the search of multiple properties. See State v. Mehner, 480 N.W.2d 872, 875-76 (Iowa 1992) ("A single warrant may authorize the search of more than one location provided the facts and circumstances of the application for the warrant show a fair probability that drugs or evidence of a crime will be found at each of the locations described."); People v. Cyr, 113 Mich.App. 213, 317 N.W.2d 857, 864-65 (1982) (holding one search warrant for sixteen properties was valid because it was specific as to the places to be searched and things to be seized). Because the constitutional requirements of particularity may be satisfied when using one application to request multiple warrants or permission to search multiple properties, the trial court erred in proscribing the Department from using this procedure.
In the cases of an administrative search, the same area wide probable cause, based upon "reasonable legislative or administrative standards" will apply to all properties in the area. See Camara, 387 U.S. at 538, 87 S.Ct. 1727. Moreover, as Camara itself provides, some balancing between the competing public and private interests is required. Id. Where the Department is seeking a search warrant based upon an affidavit stating that the properties sought to be inspected either harbor known infected trees or are properties within 1900 feet of an infected tree, it is basing probable cause on reasonable legislative standards. See § 581.184. Thus, the probable cause for an administrative search is satisfied. Outside of that 1900 foot radius, the neutral magistrate must determine whether the affidavit provides sufficient probable cause, again based upon "reasonable legislative or administrative standards." Camara, 387 U.S. at 538, 87 S.Ct. 1727.
While multiple properties may be included in a single search warrant, it is our conclusion that this must be left to the discretion of the issuing neutral magistrate. The magistrate must review each warrant to assure that it covers only property upon which probable cause has been established based upon the affidavit. How the magistrate accomplishes this is within the magistrate's discretion. Moreover, it is also limited by the statutory and practical necessity that a copy of the warrant be provided to the person named in the warrant. See § 933.11, Fla. Stat. (2002). Duplicating and delivering a warrant hundreds of pages thick would likely prove impractical.
Likewise, the affixing of an electronic signature of a judge to a warrant is also within the discretion of the issuing magistrate. There is no constitutional or statutory prohibition to a judge affixing his or her signature electronically to a warrant. In an analogous case, the second district opined in State v. Hickman, 189 So.2d 254, 259 (Fla. 2d DCA 1966), that a warrant may be validly issued with a rubber stamp signature as long as the issuance of the warrant was the act of the judge, i.e., the signature was the attestation of the judicial act. When a judge issuing a warrant directs the use of an electronic signature, *1060 it is clear that the judge is attesting to the act of issuing the warrant. Accordingly, we find no prohibition to the use of an electronic signature, so long as it is the judge who authorizes and is in control of its use.
The record here, however, discloses that in one instance an issuing magistrate authorized the Department to affix his signature to search warrants. We disapprove of a procedure which would permit the Department itself to prepare and electronically sign warrants with the judge's signature. However, technologically there is no reason why the Department could not provide the judge the software, expertise, and assistance to issue such warrants without the judge actually permitting the Department to electronically sign the warrants on the judge's behalf.
In summary, we conclude and hold that section 581.184 is constitutional. The statute does not violate either substantive or procedural due process, and does not permit a taking without just compensation. In order to conduct administrative inspections of appellees' property without their consent, the Department is required to obtain search warrants in conformance with the Fourth Amendment and Article I, Section 12, of the Florida Constitution. We hold that section 933.07(2), providing for area-wide warrants, is unconstitutional and a violation of the Fourth Amendment. However, we conclude that the trial court's remaining restrictions on the issuance of a warrant, including the requirement of a single affidavit and search warrant for each individual property and the prohibition of the issuing judges' electronic signature, are neither statutorily nor constitutionally based. We therefore reverse the temporary injunction and quash the orders of the trial court restricting the application for warrants in this case. We remand for further proceedings consistent with this opinion.
KLEIN and STEVENSON, JJ., concur.
NOTES
[1] This subsection of the statute is repealed effective July 1, 2005. It will be reviewed by the legislature prior to that date. See Ch.2002-11, § 4, at 314, Laws of Fla.
[2] Although this order is technically a temporary injunction, the trial court held that after appellate review, all of the questions of law resolved in the order would become law of the case. Thus, the trial court intended its ruling as to the constitutionality of the statutes to be final.
[3] While the Mid-Florida Growers' court relied on Article X, Section 6, which authorized the exercise of the power of eminent domain, in Smith the court expressly rejected the eminent domain power as the source of the taking of trees.
[4] We are aware of Department of Agriculture & Consumer Services v. Polk, 568 So.2d 35, 43 (Fla.1990), which upheld a trial court's ruling that owners of healthy trees within 125 feet of an infected tree were not entitled to compensation. The court believed the trial court's determination that such trees had no value was actually a determination that the destruction of those trees did not constitute a taking. See id. at 40 n. 4. (It appears that a majority of the court may not have adopted this reasoning, as only two other justices concurred in full with the opinion.) However, in that case the destroyed trees were for sale in a commercial nursery, and any tree exposed to citrus canker has no value for commercial purposes. This would be particularly so of commercial nursery stock, as no grower would knowingly buy exposed trees. Because citrus canker does not necessarily destroy the tree or affect the fruit for human consumption, that rationale would not make homeowners' citrus trees worthless.
[5] Although Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 24, 30 (Fla.1990), approved an administrative compensation plan for trees destroyed under the citrus canker eradication program, the provisions of that law do not apply here. Instead, the Legislature adopted a per-tree compensation allotment for destroyed trees. See § 581.1845.
[6] The order actually states that section 933.02 is declared unconstitutional, but the rationale in the order applies to section 933.07(2). We therefore conclude that this was a clerical error in the opinion.
[7] The court found that all intrusions by the Department onto the property of appellees constituted a search of a constitutionally protected area. Although it is in no way determinative of the issues of this appeal, the trial court's determination was over-inclusive of what is protected by the Fourth Amendment. Courts have extended the Fourth Amendment protection to the "curtilage" of the home, meaning that area "so intimately tied to the home itself that it should be placed under the home's `umbrella' of Fourth Amendment protection." U.S. v. Dunn, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The following factors should be examined to determine whether an area should be considered curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature and uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Id. at 301, 107 S.Ct. 1134 (citation omitted).

The above analysis is necessarily dependent on the facts comprising each individual situation. While the trial court announced that it found the concept of "curtilage" encompasses the entirety of the property surrounding the home, the court's bright line test does not comport with the case-based analysis of what constitutes curtilage. An unfenced front yard, for instance, is not generally considered protected by the Fourth Amendment due to the lack of expectation of privacy in what is visible to the entire public, while a backyard is, as a general rule, protected. Compare Wysong v. State, 614 So.2d 670 (Fla. 4th DCA 1993), with Morsman v. State, 360 So.2d 137 (Fla. 2d DCA 1978). However, even these general rules are subject to the fact specific analysis required by Dunn. Therefore, the trial court erred in requiring the Department to obtain a search warrant for every entry upon property without considering first whether the property was even protected curtilage for purposes of the Fourth Amendment.
[8] The Department also contends that the warrant is not required based upon the "traditionally regulated industry" exception to the warrant requirement. See U.S. v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). While that exception may apply to the citrus industry itself, it has no application to an individual homeowner with a backyard citrus tree, who is not part of the regulated business.